THE COYOTE GOLD AND SILVER MINING COMPANY, RESPONDENTS, *v.* WILLIAM RUBLE AND WALTER RUBLE, APPELLANTS.

CORPORATIONS—POWER OF DIRECTORS—FUTURE PROFITS.—In forming a corporation under the statutes of Oregon, it is the province of the corporators to perfect the corporation by opening stock books and obtaining subscribers to the capital stock. The corporators have no power to make regulations which shall bind the action of the directors in disposing of the future profits of the corporation, except so far as the same are regulated in the articles of incorporation.

IDEM—FUTURE CORPORATION—PROPERTY HELD FOR.—The corporators may receive and hold property for the use of the corporation to be formed by them.

Idem—Stockholder.—A person may be a corporator who is not a stockholder.

Idem—Records only Evidence.—The proceedings of a corporation must be shown by its records.

Idem—Assessment, Liability for.—To make a stockholder liable to pay an assessment on his stock, the assessment must be made by the directors, which must be proved by the records of the corporation.

Idem—Stockholders' Agreement.—Agreements made by the stockholders of a corporation before it is organized by electing directors, to become binding must be adopted or agreed to by the corporation or the directors thereof after it is organized.

Idem—Stock must be Subscribed.—The stock to a corporation necessary to its organization must be subscribed before the corporation can be legally organized.

Idem—Subscriptions, how Made—Express Authority.—To render a person liable as a stockholder to a corporation, he must sign his name to the subscription of stock, or authorize an agent to do it for him, and this authority must be express, and not implied.

Idem—Original Stockholders—Estoppel.—All original stockholders are only made liable on their subscriptions for stock by a writing, and are all equal before the law, and there is no estoppel between them.

Idem—Directors.—Papers and agreements made by persons contemplating becoming stockholders to a corporation before an organization, and not intended to be subscriptions to stock, and relating to the future management of the corporation, do not give authority to the secretary of the corporation to place the names of the persons who subscribed such papers and agreements in the list of stockholders on the stock book.

Idem—Notice to Stockholders—Estoppel.—In an action by a corporation to recover a subscription to stock, the conditions of the subscription may be inquired into, for both parties are chargeable with notice of such conditions, and there is no estoppel.

Idem—Stockholder Required to Convey to Company, When.—Where R. purchased with his own money certain mining claims, with the understanding that he would transfer the same to a company, of which he was one, which company was to own these claims, with other claims, which were to be worked together, it being necessary to so work them to secure water-rights to make the whole valuable; and R., after securing in his own name claims which if held by him in severalty would greatly injure the other claims of the company, may be required to convey to the company, on being tendered to him the money he paid for such claims.

Appeal from Jackson County.

This is a suit to enforce a trust concerning real property, and for an injunction and damages against the appellants. The respondent corporation was incorporated for the pur-

pose of owning and working certain placer mining claims, with a capital stock of two hundred thousand dollars, in shares of the par value of one dollar each.

The complaint alleges that the claims and property in question were, at the date of the incorporation, to wit, August 27, 1878, owned by the several following named parties, each owning certain distinct parcels thereof: O. Jacobs' and H. Kelly, Ash & McWilliams, P. H. O'Shea, Davis & Rathbon, John Robertson, and Daniel Mathews. That the appellant, Wm. Ruble, as a subscriber to the capital stock of the incorporation, obligated himself to, and promised and agreed to pay upon his subscription for fifty thousand shares of the capital stock, the sum of ten thousand dollars—seven thousand dollars thereof down, and three thousand dollars on or before the first day of November, 1878, and the further sum of twelve thousand five hundred dollars when realized out of one half of the net proceeds of one fourth interest of the said mines.

That Ruble agreed and promised to pay the said sum of money to the persons then owning the said mining claims, to apply upon the consideration to be paid therefor for the use and benefit of the corporation, and to take and receive from such of said owners, to whom such payment should be by him made, conveyances to the company for such portions of the said mining claims, lands, property, fixtures, and appurtenances as should be by him paid for.

That on or about the fourth day of September, 1878, Ruble did, in accordance with his promise, and in pursuance of the trust reposed in him, pay upon his subscription the sum of nine thousand five hundred and fifty dollars, and of other money belonging to the company the sum of seven hundred and fifty dollars, in the following amounts, to the following-named parties, to wit: Davis & Rathbon, two thousand dollars; Ash & McWilliams, four thousand dollars; P. H. O'Shea, three thousand three hundred dollars, and John Robertson, one thousand dollars.

That he, Ruble, took from such parties, conveyances of the property in question, to himself, instead of to the company, and that on the twenty-seventh of November, 1878,

he fraudulently conveyed to the appellant, Walter Ruble, the mining claims, ditches, water rights, and flumes, known as the Davis & Rathbon and John Robertson claims, which had been conveyed to Wm. Ruble as aforesaid; that Walter Ruble took with knowledge of the trust and without consideration.

Wm. Ruble answered and denied all the material allegations of the complaint except the existence of the corporation, which, it is alleged, was constituted on the sixth day of September, 1879, and alleges that he is damaged by reason of the injunction sued out in the sum of ten thousand dollars, and demands judgment accordingly. Walter answers by denying the allegation of the complaint and claiming damage by reason of the injunction in the sum of eight thousand dollars.

The circuit court decreed a conveyance of the property to the company and adjudged damages in its favor in the sum of four thousand dollars.

*John Kelsay, J. F. Gazley, and Thayer & Williams,* for appellants.

*C. W. Kahler, A. C. Jones, R. Mallory, W. H. Holmes, and J. H. Reed,* for respondent.

By the Court, Boise, J.:

The issues of fact, presented by the pleadings, are: 1. Was William Ruble a stockholder in the corporation, of fifty thousand shares of the capital stock? 2. If he was such owner, did he become legally liable to pay the same to the corporation before he bought the land in question? 3. Was the money which Ruble paid for the land in question the property of the corporation? 4. If not the money of the corporation, was Ruble acting for the corporation as its agent in buying this land, and so related in his actions in buying the land that he now holds the same in trust for the corporation?

The respondent's claim is that Ruble is its trustee, holding this land for the benefit of the corporation.

To show the affirmative of these several propositions the counsel for the respondent offered in evidence, first, a writing, which is as follows:

" Know all men by these presents, that we, the undersigned subscribers to stock in a certain gravel mine situated on Coyote creek, in the counties of Jackson and Josephine, in the State of Oregon, agree to pay I. N. Muncy fifty per cent. of the capital value for each and every share set opposite our names, as follows: Twenty-five per cent. in hand, and twenty-five per cent. when taken out of the mine, over and above expenses.   The said mine is to be divided into two hundred thousand (200,000) shares, of the par value of one dollar each, in gold coin of the United States.   It being understood and agreed that each and every subscriber is to have one half of the net proceeds of the mine, *pro rata*, to the whole amount of the capital stock, until his stock shall be paid in full in said coin, as above mentioned, then he is to receive the amount of stock for which he has subscribed, free from all incumbrance, and full dividends thereafter upon said stock.   It being further agreed and understood that the said Muncy is to, at his own expense, extend the ditch known as the McWilliams & Co. ditch down the said creek to a point on the hill above a claim known as the Robertson claim, and to purchase and place upon said mine another pipe fifteen inches in diameter, and of sufficient length for the successful working of said mine, together with a giant and flume corresponding to the same:

Paid Jay Francis............................................  320
Paid by note, Joseph F. Lindsay...............................  5,000
Paid by note and horse, James Chenoweth ......................  1,000
Paid 25, Jennette Webb........................................  100"

It will appear by inspection of the record, as well as by the subsequent testimony, that the name of Wm. Ruble, together with the amount of stock by him subscribed, and the words, " as per arrangement," in the margin, are all in his own writing.   This paper is not dated, but was signed by Ruble August 27, and which is the same date as the acknowledgment of the articles of incorporation.

Next after this paper the respondent offered in evidence

the articles of incorporation and another writing, which are as follows:

## Exhibit 2.

Coyote Gold and Silver Mining Company, incorporated at Salem, Oregon, August 27, 1878, as follows:

Be it known that the following articles of incorporation are this day entered into by I. N. Muncy, J. L. Murphy, David Stump, and Wm. Ruble, for the purpose of mining in gold, silver, and other precious metals; to purchase placer mines of gold, or ledges of gold, silver, or other precious metals; construct or purchase and own water ditches, quartz mills, or any other thing necessary to the successful prosecution of the work of mining.

Article 1. The name of the company or corporation shall be known as the Coyote Gold and Silver Mining Company.

Art. 2. The duration of the company shall be indefinite.

Art. 3. The place of operation of this company shall be in Jackson and Josephine counties, in the state of Oregon.

Art. 4. The principal office of the company or corporation shall be at Leland, Jackson county, Oregon.

Art. 5. The amount of the capital stock of said company or corporation shall be two hundred thousand dollars, which shall be divided into two hundred thousand shares of one dollar each.

The above act of incorporation was executed in the city of Salem, in Marion county, Oregon, on the twenty-seventh day of August, 1878, signed by I. N. Muncy, J. L. Murphy, David Stump, and Wm. Ruble, incorporators, acknowledged before H. A. Johnson, justice of the peace in and for said county, and filed in the office of the secretary of state, September 2, 1878.

The incorporators named in the foregoing articles of incorporation agree and bind themselves severally to accept and to cause the directors of said company, when elected and organized, to ratify the contracts and purchases of certain bar and placer gold mines situated on Coyote creek, in Jackson and Josephine counties, Oregon, made by I. N. Muncy and Wm. Ruble.

And it is further agreed that stock books shall be opened,.

and the sale of stock of said company be ordered to the amount of two hundred thousand shares (including any shares already subscribed), of the par value of one dollar each, in gold coin of the United States, upon the following terms, to wit, that each share shall be sold for fifty per cent. of its par value, the payment to be made as follows:

Twenty-five per cent. of the par value in cash at the time of subscribing, and twenty-five per cent. to be taken out of the net proceeds of the mines, it being understood and agreed that each subscriber shall be entitled to receive, as dividends, one half of the net proceeds, according to the number of shares he holds, and that the other one half shall be retained by the company until the sum so retained shall equal his indebtedness for stock.   Thereafter he shall receive certificates of paid-up stock for all the shares he may hold clear of all incumbrance, so far as the company is concerned, and full dividends.

It is further understood and agreed that said incorporators shall, within a reasonable time, extend the ditch known as the Ash & McWilliams ditch down said Coyote creek to a point on the hill adjacent to a claim known as the Robertson claim, and that they will purchase and place on said mines, in addition to the hydraulic already there, another pipe of fifteen inches in diameter, and of sufficient length for the successful working of the mine, together with a giant and flume corresponding to the same.

It is further agreed that the one half of the net proceeds to be retained by the company, as above specified, shall not remain as assets in the hands of the company, but shall be drawn out by the four incorporators as it accrues in the following ratio, viz: Wm. Ruble, one half ($\frac{1}{2}$), I. N. Muncy, three eighths ($\frac{3}{8}$), J. L. Murphy, three fortieths (3-40), and D. Stump, one twentieth (1-20), said sums to aggregate twenty-five thousand dollars, and no more.

It is further agreed that after the payment of the purchase-money of said mining claims, the drawing of the twenty-five thousand by the four incorporators, as above specified, the payment of all costs and expenses of extending the ditch, purchasing and placing in position in work-

ing order the pipe, flume, and giant, together with implements and tools for working said mines, all sums accruing from the sale of any remaining stock of said company shall be paid to I. N. Muncy. And in consideration of the last named agreement, the said I. N. Muncy binds himself, his heirs and assigns, to put the said company in full possession, with right and title, to all mining claims on Cayote creek, beginning at the lower end of a mining claim formerly owned by Davis and Rathbon, and extending up said creek nearly three miles, including all the mining ground owned on said creek by Davis and Rathbon (and Marshal), H. Kelly, O. Jacobs, Robertson, O'Shea, Mathews, and Ash & Williams, together with all water rights, mining privileges and appurtenances thereunto belonging, to said company, to have the same in fee-simple, yet so as the net proceeds shall inure to the benefit of the stockholders upon the terms and conditions herein specified:

|  | Sept. 14, 1878. |
| --- | --- |
| Subscribers' Names. | Amount of Stock. |
| David Stump | 5,000 shares |
| J. L. Murphy | 7,500 " |
| Wm. Ruble | 50,000 " |
| J. F. Bewley | 2,000 " |
| W. F. Lemon | 100 " |
| Z. Davis, per I. N. Muncy | 2,000 " |
| E. A. Chase, per I. N. Muncy | 1,000 " |
| H. Kelly, per I. N. Muncy | 1,000 " |
| T. S. Rodsbaugh, per I. N. Muncy | 5,000 " |
| I. N. Muncy | 50,000 " |
| G. W. Sloper | 50 " |
| John Vernon | 1,000 " |
| H. D. Ray | 2,000 " |
| R. Doty | 2,000 " |

This last paper which is attached to the articles of incorporation, is dated on the fourteenth day of September, 1878; and it seems (from a comparison of dates with the records of the corporation) was executed the day that the stockholders met to organize the corporation, and from its terms indicates that it was executed before any organization was made, and was preliminary thereto, and with a view to securing an endowment to Monmouth College of twenty-five thousand dollars. In order that the provisions should

in any way become binding on the corporation, it was necessary that the corporation, after it was organized, should accept and approve of these provisions; and whether or not the corporation did so adopt and approve can only be shown by the records of the corporation. For neither the corporation nor others who contemplate taking stock can, before the corporation has been organized by electing directors, dispose of the future earnings of the corporation nor fix rules to control the action of the directors to be elected.

The statute, p. 525, secs. 5 and 6, provides for and fixes the powers and duties of corporations. Their office is to start the corporation and proceed to perfect its organization as provided for in section 7, and it is only after such organization that it is capable of carrying on the enterprises enumerated in the articles of incorporation. The acts which the incorporation are authorized to do are such as tend to promote the final organization by the election of directors, when the stock becomes liable to be assessed for the purpose of raising funds with which to prosecute its legitimate enterprises. It was not contemplated by the statute that the corporation should be empowered to make assessments and prosecute the business for which the corporation was created. The stock is not due and liable to assessment until after the organization by the election of directors; and it is provided in section 7 of the act, "that at the organization each stockholder shall be entitled to one vote for such share of capital stock subscribed by him; but after such first election of directors, no person shall vote on any share upon which any installments or portion thereof, is then due or unpaid." Section sixteen, also, provides " that if any such corporation does not elect directors and commence the transaction of the business for which it was formed, within one year from the time of filing articles, etc., shall be divested of its corporate rights."

The stock is the capital of the corporation on which it is to do business, and it does not become available for that purpose until after directors are elected. All proceedings of the corporators (who need have no pecuniary interest in the corporation) which are prior to such election are steps

in the organization, and are not binding on the corporation except so far as they promote such organization, and the business for which the corporation was formed, as expressed in the articles. And, indeed, the whole spirit of the act indicates that in order to perfect a corporation for prosecuting its enterprises the election of directors is a condition precedent to its perfect organization for business purposes. We think a corporation may hold property necessary for its contemplated enterprises, before its organization is completed, and preserve such property for its future use, and that the corporation exists as a legal entity from the time of the filing of its articles. But the corporators who represent it prior to a meeting of the stockholders are its agents, to perfect its organization and put it in working order, rather than to carry on its business enterprises.

We think that the paper offered in evidence executed on the twenty-seventh of August, 1878, contains no stipulations or agreements which afterwards became binding on the corporation or any of the persons who signed it, for the reason that there is no competent evidence showing that the provisions contained in said agreement were ever adopted or agreed to by the corporation, and that such an agreement by the corporation can only be proved by the records of the corporation, and there is no such record in its proceedings. The same may be said of the other agreement made on the fourteenth of September, 1878. This contained stipulations which could not bind the corporation unless agreed to by the corporation, for it provided for the disposition of the profits of its future business, and it is a self-evident proposition that neither a person nor corporation is bound by a contract which was never agreed to by such person or corporation. We think that Ruble did not become a subscriber by signing these papers above referred to.

We do not, however, decide but what these documents may be competent as tending to show that he authorized his name to be put on the stock books and to explain his subsequent conduct. But suppose Ruble was a subscriber, when did he become such? Certainly not until he authorized his name to be subscribed to the capital stock, by his direct

act or conduct as a subscriber, and he did not act in that capacity until the organization on the fourteenth of September. What he did prior to that time for the corporation was as a corporator or agent of the corporation.

If he was a subscriber, when did he become liable to pay his subscription? We think that liability did not accrue under the corporation until after the directors were elected and an order made for a call for the stock, unless by the terms of the subscription the payment is to be made without a call. So this subscription could not in any event have been demanded before the fourteenth of September. Prior to that time the corporation had no secretary or treasurer, or capacity to demand subscriptions. So if this position be true, Ruble, at the time he purchased these claims was not owing the corporation the money he paid for the property, and it was his unless he voluntarily parted with it to the corporators, of which there is no evidence (except that the money was carried to the depot in the canteens of Muncy, which Ruble had borrowed), and he then had the legal right to invest the money on his own account, for it was still his money though he may then have instructed to pay it on his future subscription to the corporation, and if he did go to the mines to buy these claims for the corporation with his own money, and afterwards changed his mind, either from a good or bad motive, and took the deeds in his own name, there would be no such resulting trust to the corporation as could be enforced against him until the purchase money was refunded to him or he be placed in such a relation to the corporation as would be equivalent to a tender of the purchase money which he had paid. It is claimed that he owed the corporation this amount at the commencement of this suit. To put him in such a position he must be a subscriber to the stock of fifty thousand dollars. The records of the corporation must show that this amount is due and owing. To show this, it must be shown by the records of the corporation: 1. By the stock book signed by Ruble or evidence equivalent to such signing. 2. That one half of the capital stock of the corporation has been subscribed. 3. That an assessment has been made on

all of such stock for cash for twenty-five per cent. of such stock.

None of these things appear from the records of the corporation, except that one half of the capital stock appears in a list on the stock book to be subscribed. But all the names of the subscribers appear to be placed in this list by the secretary, William Ruble, except his own name, which is in the handwriting of W. F. Briggs, and without the consent of Ruble, who refused to sign the same, and this list was so made by the secretary after this suit was commenced. The undertaking to which these names are subscribed is as follows: "We, the undersigned, subscribers to the capital stock of the Coyote Gold and Silver mining Company, do hereby bind ourselves to take the number of shares that we subscribe for, and to pay therefor in United States gold coin, as per conditions entered into by the incorporators and others, in the town of Monmouth, Polk county, Oregon, September 14, 1878, and recorded in the journal of said company, on pages 5, 6, and 7." "Names of original subscribers." Then follows the list of subscribers in the manner following:

| Subscribers' names. P. O. Address. | Amount of stock. | Amount paid. | When paid. |
|---|---|---|---|
| David Stump, Monmouth, Polk Co. | 5,000. | $2,500. | Jan. 17, 1879. |

And other subscribers in like manner. These conditions referred to in the undertaking are contained in exhibit number two, above set out in this opinion. One of these conditions is, "that the incorporators agree and bind themselves severally, to accept, and to cause the directors of said company, when elected and organized, to ratify the contracts of and purchases of certain bar and placer gold mines, situate on Coyote creek, in Jackson and Josephine counties, Oregon, made by J. N. Muncy and William Ruble." Another condition is, "that said incorporators shall, within a reasonable time, extend the ditch known as the Ash and McWilliams ditch down said Coyote creek, to a point on the hill adjacent to a claim known as the Robertson claim, and that they will purchase and

place on said mines, in addition to the hydraulic already there, another pipe of fifteen inches in diameter, and of sufficient length for the successful working of the mine, together with a giant and flume corresponding with the same." This agreement was intended to limit and regulate the action of the corporation then to be organized, and which was organized on the same day this agreement was executed; and in order to make the subscribers liable for stock, it was incumbent on the corporation when organized, to perform and carry out the conditions of the contract which the subscribers had signed, and which was the foundation of their liability. They should have notified the contractors and purchasers of J. N. Muncy and Ruble, or attempted to do so by some resolution or proceeding of record; and also the incorporators should have extended the ditch and placed the pipe and a giant in the mine as agreed. And it should appear from the records of the corporation, that it had performed on its part, before it could compel individual stockholders to perform by paying subscriptions. The directors of this corporation show by their record no compliance or attempt to carry out these fundamental conditions above named. Nor is there anything said or done in said records as to any effort being made by the corporation to have J. N. Muncy put the company in the possession of the mining claim named in the last part of said agreement. Nor does said Muncy comply or attempt to comply with his part of said agreement.

It is evident from this agreement that the opening of stock books and the ordering of the sale of stock were proceedings to be had after the corporation was organized, and such orders should appear in the records of the corporation.

The corporation had no authority to make this order to reduce the stock to half price, for the statute limits their powers, section 4, page 525, when it says the articles shall specify " the amount of the capital stock," and "the amount of such shares of such stock." This must be the true, not the fictitious amount.

Thus section 6 provides that it shall be lawful to organize when one half of such stock is subscribed, so that the

incorporators could not order that the stock should be paid in full on the payment of one half. And it appears from the records of the corporation which are before us in evidence, that as yet no such proceedings have been had by this corporation as will enable them to enforce the payment of this stock against individual stockholders. And consequently the corporation shows no indebtedness due from Ruble to them, which is an equivalent of a tender to him of the money he had paid for this land.

It is claimed by the respondent that Ruble is estopped from disputing that he was a subscriber of fifty thousand dollars of the capital stock of this corporation, by his acting as secretary, and acting and voting as a subscriber, and serving as a director. The evidence shows that at the meeting of those who claimed to be stockholders and who elected the directors, each individual voted one vote without reference to the number of shares held by him, and that at that time no subscription had been made to the capital stock which would bind any subscriber to pay, unless he became so bound by having voted at this meeting, or acted as an officer. The list of stockholders whose names appear on the stock book, appear to have been placed there after this organization by the secretary, and would not be the subscriptions of these individuals unless authorized or assented to by them. These preliminary papers were not subscriptions, and did not authorize the secretary to subscribe the stock book for the persons who had subscribed these papers. (*Granger Market Co.* v. *Vinson*, 6 Or. 172.) If any of these persons whose names are on this stock book were sold for a call on the stock, he could answer that he had not subscribed; or, if he had subscribed, could set up any condition precedent to payment, to be performed by the corporation, and which had not been performed. As in this case, the conditions in the agreement of September 14, to be performed by the corporators, had been violated, for as between the corporation and its stockholders, the conditions of a subscription may be inquired into, for both parties are chargeable with notice of these conditions, and there is no estoppel. Any actions or declarations of

Ruble, made after the election of directors, that he was a subscriber, are evidence to show that his name was placed on the stock book with his assent, and if, in this case, one half of the capital stock of this corporation had been actually subscribed, and the corporation duly organized by the election of directors, as pointed out by statute, and Ruble had accepted the position of director, supposing that his subscription to these preliminary papers amounted to a subscription, he might be held as a subscriber; and if sued for one assessment, could only make as a defense that the same was not due by the conditions of the subscription. But in this case, as has already been said, this corporation proceeded to organize before the stock was subscribed, and as the proceedings were fatally defective, any member might repudiate it as between his fellows, unless afterwards he subscribed the stock, or so far proceeded with his fellows in the business as to cure this defect, and there is no legal evidence that any new obligations were assumed. There is a large amount of testimony tending to show that Ruble was active in getting up this corporation, and inducing others to take an interest in it. But all these parties were bound to take notice of the condition of the corporation, for each had access to its original subscription, if any there was, the same as Ruble, and as all subscriptions must be in writing, all stockholders stand equal before the law.

When this corporation claims that Ruble owes it twelve thousand five hundred dollars, as one fourth of his capital stock to the corporation by him subscribed, and he denies the subscription, it is necessary for the corporation to prove the subscription by producing the subscription signed by Ruble, either by himself or by another for him with his authority, or by some acts of his which are equivalent to a subscription. And as has been already stated, we do not think these acts show that he was a subscriber, or that the proof shows that the other persons whose names are put down as subscribers in the stock book have subscribed in such a manner as would make them liable to an assessment for unpaid stock. (See 6 Or. 172.) But we think the evidence does show that Ruble purchased the property in

question, intending at the time that it should be for the use of the company, and that he took the title in his own name to secure himself for the money he paid, and that he continued to hold it with such intent until after the meeting at Monmouth on the fourteenth of September, 1878. For on that day, in the agreement of that date already set out, the incorporators, of whom Ruble was one, agreed to bind themselves severally to accept, and cause the directors of the corporation, when elected and organized, to ratify the contracts and purchases of certain bar and placer gold mines, situate on Coyote creek, in Jackson and Josephine counties, made by I. N. Muncy and Wm. Ruble. And the evidence establishes the fact that the mines referred to in this agreement as purchased by Ruble are the property in controversy. And as Ruble signed this agreement, we think he plainly signifies in it his intention to transfer this property to the corporation, and as the evidence shows, that it was the object of all the parties (including Ruble) to secure all these claims and the water to work them, because they would be much more valuable if owned and worked together than if owned severally. If for any reason Ruble saw fit to withdraw from the corporation and not subscribe to the capital stock, he should, on being paid the money he expended in securing these claims, transfer the same to the corporation, and it is not equitable in him to hold a part of those claims to the manifest injury of those who joined with him in trying to secure what they evidently thought a valuable mine when consolidated in one ownership.

But we do not think this court can make a corporation for the plaintiff from the evidence, with Ruble as member and stockholder, and declare him indebted to the corporation the sum of money he paid for this land. And if the corporation desires this property, and it is of the great value claimed by the plaintiff, no injustice would accrue to the plaintiff if Ruble should retire from this mining enterprise, and on the payment to him of his money, be required to transfer the property to the corporation; and the plaintiff can have no pecuniary interest in holding Ruble as a mem-

ber of the corporation, unless the land is worth less than he paid for it, or it be desirable for the plaintiff to return the money paid by Ruble as working capital. And as he purchased these mining claims with his own money, but under such representations to the incorporators as would make it inequitable for him to hold the same against the corporation (provided the corporation tenders him the purchase-money), because this land is so situated as to render valueless the other claims about which all these corporators were negotiating, and to work which the corporation was formed, it will be necessary for the corporation to first tender Ruble his money, or put him in a position of indebtedness to the company, which is equivalent to a tender, which has not been done. (Perry on Trusts, sec. 129.)

We think, therefore, that the plaintiffs have not proven the essential facts to maintain their complaint, and that the decree of the circuit court should be reversed and the plaintiff's bill dismissed.

Mr. Justice PRIM, dissenting:

Being unable to agree with the opinion of the majority of the court in this case, I feel compelled to dissent.*

Under the facts as developed by the evidence in this case, I hold that it was the duty of Ruble: 1. To have filed the third articles of incorporation in Jackson county; and, 2. To have bought the mining ground in dispute for and in the name of the corporation then being formed for that special purpose; not, as is claimed by him, with money of his own, which was to be returned to him, but with money which he, and others engaged in the enterprise, had agreed to advance for that purpose, and in consideration of which Ruble was to own and to have issued to him fifty thousand shares of the stock of the corporation, when the same was in a condition to make such issue.

But it is sought, on behalf of Ruble, to repudiate and avoid his agreement with the subscribers to the preliminary agreement and with his co-corporators, on the ground that

---

* A very full statement of facts embodied in the opinion is omitted.—RE-PORTER.

the corporation was not in existence at the time when the agreements were made and at the time the conveyances were taken, as at that time the third articles of incorporation were in the possession of Ruble, and not on the files in Jackson county, where, under his agreement, they should have been. This position appears extremely technical, and, in my judgment, should not be allowed to prevail. Ruble, being at the time a special agent and trustee for the purpose of filing these papers and securing these mines to the corporation plaintiff, ought not to be allowed, even in a court of law, much less in a court of equity, to take advantage of his own wrong and want of good faith, since equity always treats "that as done which of right and justice should have been done."

It is further claimed that Ruble was exonerated from compliance with his agreement on account of irregularity in the organization of the plaintiff corporation, as well as informality in its subsequent proceedings. In answer to this position, it may be suggested that it could have made no difference whatever with Ruble as to what was to have been done after he had complied with his agreement, inasmuch as he did not comply with it, whether the subsequent proceedings were regular or not. Thus it will be seen that subsequent informality could not exonerate him. And it will be further noticed, by closely observing the facts, that nothing would have gone wrong in the entire enterprise, except for Ruble's own dereliction and want of good faith. In the view which I have taken of this case, I regard it as immaterial whether Ruble, technically and in the strict sense of the term, became a stockholder in the plaintiff or not. There can be no doubt but that the preliminary subscription, gotten up by Muncy, related to the property in question, and that the plaintiff was incorporated for the purpose of absorbing this very preliminary association. It was understood between Ruble and his associates, after subscribing the Muncy papers, that he was to own one fourth of these mines, and that the others were to own interests therein in proportion to the amount subscribed. After signing the Muncy papers, Ruble took a lively inter-

est in the enterprise, and assumed nearly the entire management, thereof, suggesting the propriety of incorporating immediately, preparing the articles of incorporation, and causing them to be executed, acknowledged, and filed, as required by the statute in such cases.

In the organization of the incorporation the Muncy subscription was adopted as its subscription of stock, as is conclusively shown by the construction placed upon it by all parties concerned in the enterprise. All the subscribers, including Ruble, recognized and treated it as such. Ruble notified them, as subscribers of stock, to appear at Monmouth on September 14, 1878, for the purpose of organizing the corporation, by electing directors and other officers. All of the subscribers, in obedience to this notice, did appear either in person or by proxy, and the organization of the plaintiff, then and there accomplished, was based upon this subscription and none other. Ruble claimed to own fifty thousand shares in the stock by virtue of said subscription and the right to vote the same. As a matter of fact he was elected one of the directors of the corporation by virtue of this subscription, and he was also elected secretary of the corporation. Both of these offices he then and there accepted, and entered upon the discharge of these duties. As such secretary he transferred the preliminary subscription to the regular stockbook of the company, with the exception of his own subscription, which he failed and refused, for some cause, to transfer. He also issued certificates of stock to all the subscribers except himself. Having thus taken the lead and principal management of this enterprise upon himself, he has succeeded in securing the title to the property in dispute in his own name; which virtually gives him control of the other mines not conveyed to him, as he has succeeded in securing those which control the water rights.

I claim that, under the facts in this case, Ruble is estopped in equity from denying that he is a stockholder in the plaintiff. (Thompson on Liability of Stockholders, secs. 105, 124, 162, 165, 166; 5 Otto, 667; *Dong* v. *Naper*, Supreme Court of Ill., 8 Reporter, 522.)

And while I concede that in equity Ruble may have been entitled to a lien upon the property in dispute, to secure him in whatever amount he may have advanced or paid on the property in excess of his proportion, and that while the court might and should have secured said lien by a proper decree, I am unable to assent to the proposition that he may "change his mind, either through good or bad motives," and wholly retire from the enterprise and hold the property in his sole right, unless his associates shall refund to him the whole amount advanced by him to pay for said property.

In my opinion the bill ought to be retained and the decree of the circuit court modified in accordance with the views herein expressed.