*STATE OF OHIO v. LEVI MARTIN MILLER.

1. VALIDITY OF AFFIDAVIT AND WARRANT IN WHICH THE ACCUSED IS DESCRIBED BY INITIALS ONLY.

Where an affidavit charging a person with the commission of a crime, describes the accused by initials merely, the first or Christian name being omitted, and a warrant is issued upon such affidavit, also describing the accused by initials merely: *Held*, that such warrant is not void for that reason, the same being regular in form in all respects to constitute it a valid warrant for the arrest of the accused, and the officer having such warrant to execute is clothed with the authority to make the arrest.

2. PLEA OF MISNOMER.

In criminal procedure at common law, if a party is indicted by any other than his true name, he may for plea in abatement of the action, say it is not his true name—that there is a misnomer in the indictment; but he must first give in such plea his true name.

3. CONSIDERATION OF THE DEFENSE OF INSANITY IN A CRIMINAL CASE.

The defense of insanity in a criminal case is a meritorious defense when made out, and should receive full consideration by the court and jury.

4. BURDEN OF ESTABLISHING THE INSANITY OF THE ACCUSED RESTS UPON THE DEFENSE.

Where insanity is interposed to excuse the taking of human life, such defense must be established by a preponderance of the weight of the evidence, and the burden of establishing the insanity of the accused affirmatively to the satisfaction of the jury, in the trial of a criminal case, rests upon the defense.

5. RIGHT OF OFFICER TO RESORT TO STRATEGY IN EFFECTING AN ARREST.

In attempting the arrest of one accused with the commission of a crime, who is found expecting the officer and is armed with deadly weapons to resist the arrest, it is the right of such officer to use necessary strategy to disarm the accused before producing the warrant.

6. CHARGE OF COURT AS TO THE CONSIDERATION OF EXPERT EVIDENCE ON THE QUESTION OF INSANITY.

Where the court in charging the jury regarding expert evidence on the question of insanity, told the jury to receive such evidence with caution, and this admonition occurred twice in this branch of the charge: *Held*, that the instruction of the court applied to both sides and that the character of the evidence *pro* and *con*, furnished good reasons for the caution, and, therefore, the court committed no error.

ERROR to the Court of Common Pleas of Seneca county.

PRICE, J.

At the October term of the court of common pleas of Seneca county, held in the year 1895, the plaintiff in error was indicted by the grand jury of the county for the murder of one August Schultz, on the 23rd day of October, 1895, in said county.

In this indictment the accused, the plaintiff in error, was described by name, as follows: Leonard J. Miller, *alias* Levi J. Miller, *alias* Leon J. Martin, late of said county.

*The judgment in this case was affirmed by the supreme court, without report, December 19, 1896. See vol. 4, Legal News, 99.

On or about the 1st day of November of that year the accused was arraigned in open court, and plead not guilty to said indictment, and the court fixed the 16th day of December, 1895, as the time of the trial on the issues thus joined, and the trial was had, which resulted in a verdict of guilty as charged in the indictment.

The defendant filed a motion for a new trial, which contained the following grounds, in substance, to-wit:

1. The verdict is not sustained by sufficient evidence, and is contrary to law.

2. That the court erred in admitting evidence produced by the State, and also in excluding evidence offered by the defendant.

3. That the court erred in the charge to the jury.

4. That the court erred in refusing to instruct the jury as requested by the defendant.

5. That the instructions given were contradictory and misleading.

The court overruled the motion and passed sentence on the prisoner, to suffer the penalty attached to murder in the first degree—death.

We are asked to reverse this judgment, set aside the verdict and grant a new trial, on the grounds above stated, and we have a voluminous bill of exceptions containing all the evidence, rulings of the court on the trial, and its charge to the jury and the requests made by the accused for certain instructions to the jury in his behalf. We have carefully gone over the entire record, and have considered all questions raised in the record and by argument of counsel, and it is now our duty to pass upon and determine them in accordance with our best judgment and knowledge of the law.

It is disclosed that on the 28th day of October, last, Ezra Smith appeared before Mayor Rex, of the city of Tiffin, and made two affidavits against the plaintiff in error, but described therein by name as "L. J. Martin." One affidavit charged that "L. J. Martin" was, on that day guilty of carrying concealed weapons. The other affidavit charged that, on that day, "L. J. Martin" unlawfully assaulted said Ezra Smith, with the intent, and with deliberate and premeditated malice, to kill him, the said Ezra Smith. These offenses were alleged to have been committed in Seneca county, Ohio, and at the times referred to, and the affidavits were, in form and substance, sufficient to charge the two offenses attempted to be charged, if they were not invalid by reason of the omission of the first, or Christian name of the accused, and the description of him by initials merely, as "L. J. Martin."

The warrants issued on these affidavits contained the substance at least of the charges made in the affidavits, and commanded the marshal of the city of Tiffin to take into his custody the said "L. J. Martin," and safely keep him and have his body forthwith before him, the mayor, to answer said charge. Such is the tenor and effect of these warrants, which were regular in form in all respects to constitute them valid warrants for the arrest of the accused, unless invalidated by the want of his first name by merely describing him by initial letters, "L. J."

The warrants were delivered to August Schultz, the deceased, who was then marshal of the city of Tiffin, for execution, and he took to his assistance Officer Sweeney of the same city, and then proceeded to the home of the accused in the evening for the purpose of making the arrest. In attempting to disarm the accused in his house, and take his gun from him, he drew a revolver, fired it so that one ball entered the vital parts of the marshal and caused his death in a short time thereafter.

On the trial of this cause in the court below, as well as here, counsel for the accused claim that the affidavits and the warrants issued therein were invalid, for the reason we have stated; that no person is named therein as being guilty of any offense—that "L. J. Martin" named no one; that without a further designation or description of a full first name, or an averment that such name was unknown, or without giving some name, and saying that the true name is unknown, the affidavits and warrants were so far void as to afford no protection to the officer attempting to execute them.

Is this position tenable? If it is it has much to do with the subsequent facts of the case.

We must observe at the outset that there is a vast difference between a void affidavit or a warrant, and one that may contain such defects and variances in descriptions, which, on the trial, will warrant a discharge of the prisoner. There may be such misdescription of the injured party or the subject matter of a crime that will acquit the party when the facts are produced at the trial. But the fact that such misdescription exists, and that the facts as to the name of the injured party or description of the subject matter of the offense are very different from the charge in the affidavit and warrant, does not render the warrant for arrest void, but only ground of acquittal, for such variance, where it is, in law, material.

In criminal procedure at common law, if a party is indicted by any other than his true name, he may for plea in abatement of the action, say it is not his true name—that there is a misnomer in the indictment; but he must first give in such plea his true name. This plea, known as a plea in abatement, may be denied by the State, and an issue is thus made up to be tried by a jury, and if the jury find the facts as pleaded, the accused would be discharged because of the misnomer, although in fact he may be the guilty party. But he may be indicted by his true name and the first indictment be abandoned. But what is proven by this common law rule? Certainly not that the indictment is void, but that on that plea allowed to him as a right in the strictness of criminal procedure he was not properly described or named in the indictment. See Wharton's Criminal Law, secs. 536 and 537.

The question of misnomer at common law, being an issue triable to a jury, worked an acquittal if the plea was sustained, from the simple fact of misnomer; but the jury did not dispose of the indictment and declare it void, for it stood as the basis for the arrest of the one who might bear that name, if the facts pointed to him as the guilty party.

In the case of *Smith* v. *State*, 8 O., 294, cited in behalf of plaintiff in error, it was held, under the common law practice, that after verdict, it was too late to raise the question, of omission of the first name. In that case the accused was described as "W. E. Smith" in the indictment, and the case proceeded to trial, and conviction followed. On motion to arrest judgment, Smith raised the question of misnomer, or the use of initials for his name. The court held that it was too late; that the only mode of taking advantage of that point was by plea in abatement, and sentence was executed. This is a clear holding that the indictment and conviction were both good against "W. E. Smith," and that a plea in abatement, before trial on the facts as to the crime, was the only way of being benefited by the fact of misnomer.

Under the modern rules of the criminal code, if such plea of misnomer is made, it does not discharge the accused, but the true name is

entered on the docket, and the case proceeds thereunder. See Sec. 7254, Rev. Stat. of Ohio.

In Bishop on Criminal Procedure, sec. 685, we find the following doctrine:

"There is no reason why a man should not be known as well by a single letter for his name as by many letters. Hence, if one is commonly designated by initials for his christian and middle name, so that their use indicates plainly who is meant, it is the doctrine to which the tribunals have been tending and most of them have reached, that such initials are adequate in the indictment. To render this doctrine available, the man must be known by the initials. And allegation by the initial, and mere proof by the whole name without explanation, or the contrary, appear not to be inadequate; though, in such case, it would seem, the question is for the jury. Some courts have deemed that, when one is indicted by initials for his Christian name, a plea in abatement will be available, yet the proceedings will be good after a verdict."

A very full and instructive discussion of the effect of a misnomer of the accused, under our criminal code, is found in *Lazure* v. *State*, 19 O. S., 43.

These affidavits and warrants were not void. If the question of name or misnomer was to be raised in defense, the time and place for it was before the mayor, and, when raised there, as we have seen, the true name would have been entered and the cause proceeded to trial.

The marshal, having these warrants to execute, was clothed with the authority to make the arrest, and to arrest the right man was more important than to arrest him under a correct name.

The deceased marshal, August Schultz, bearing these warrants, and accompanied by an assistant, Sweeney, entered the house of the plaintiff in error for the purpose of making the arrest. They attempted to disarm him of his gun, and as they succeeded, Martin, or Miller as he is now named, drew forth from beneath a blouse a revolver and shot the marshal. He staggered from the room, having received two bullet wounds, and he died shortly afterwards, on the way to Tiffin.

There is no controversy as to who inflicted the wounds which proved **fatal**. The revolver in the hands of the plaintiff was the weapon that **caused** the fatal wounds.

Under the facts and circumstances which may be detailed later on, is the plaintiff in error responsible in law for the killing of Shultz; and if so, in what degree of homicide as defined by our statute?

The accused in the court below, under his plea of not guilty, also defended on the ground that he was insane at the time of the killing— if not generally insane, was laboring under insane delusions, which dominated his faculties and mind to such an extent that he was not a free agent, and should not be held accountable for his acts.

This is a meritorious defense when made out, and should receive **full** consideration by the court and jury.

It is well to understand what the rule of proof is where such defense is made, for we find that very many of the exceptions to the charge of the court, and to his refusal to charge, go to the rule laid down for the guidance of the jury.

It has been urged with great force upon us, that if, after hearing all the evidence in the case, there is reasonable doubt of the guilt of the accused, including a reasonable doubt as to his sanity, the jury should

acquit. In other words, if from all the evidence in the case, they entertain a doubt as to the sanity of the accused, it is the duty of the jury to acquit on the principle that it should appear as a result of all the evidence that it was a sane person who committed the crime. Many decided cases have been cited and read to us, but they are all from other states. Learned counsel who have spared no research in this case, have cited none from the courts of our state, although the question has many times been pressed upon their consideration..

Like the rule on the plea of self defense, our courts have laid down and adhered to the rule, that where insanity is interposed to excuse the taking of human life, such defense must be established by a preponderance of the weight of the evidence.

We find this rule laid down in *Clark* v. *State*, 12 O., 483. It is endorsed as the law in *Farrer* v. *State,* 2 O. S., 54. It is reconsidered and adopted in the case of *Loeffner* v. *State*, 10 O. S., 598. I read from the 9th syllabus in this case, not as any new law to counsel, but as bearing upon the proposition involved.

"As the law presumes every person, who has reached the age of discretion, to be of sufficient capacity to be responsible for crimes, the burden of establishing the insanity of the accused affirmatively to the satisfaction of the jury, on the trial of a criminal case, rests upon the defense, It is not necessary, however, that this defense be established beyond a reasonable doubt; it is sufficient, if the jury is reasonably satisfied by the weight or preponderance of the evidence that the accused was insane at the time of the commission of the act."

Also in the case of *Bond* v. *State*, 23 O. S., 349. The question seemed to be urged again to the supreme court, and the supreme court, adhering to the doctrine laid down in the authority I have just read in the sixth syllabus, says:

"The burden of proof to establish the defense of insanity in a criminal case rests upon the defendant, but a mere preponderance of the testimony is all that is necessary for that purpose."

In the presentation of the claim made in some of these cases for a different holding in our supreme court, we observe that many of the cases cited to us in this case, were cited to our supreme court; but we still have the uniform holding against the doctrine urged here, and the doctrine in Ohio still is, that insanity must be made out affirmatively, by the weight or preponderance of the evidence. The court below was right in this case in putting the burden of proof upon the defendant to establish the defense of insanity, and so instructing the jury as to how to consider the evidence, and wherever the defendant requested the court to give different instructions, it did not err in refusing them.

But on this subject, and bearing upon it, the court, on page 1273 of the record, did charge as follows:

"If the jury find that the defendant, at the time of the shooting, and for some weeks and months before, was laboring under the delusions that the community was against him, that his creator was against him, that his soul was lost, although he may have known right from wrong in the abstract, may have known it was wrong to commit burglary, or larceny, or arson, or to take life, yet if these delusions so far dominated his mind and actions that he acted on them and was controlled by them, and the act he did was the product of them, then he is not guilty."

And on page 1274, in modifying a request, the court gave this charge:

"The defense of insanity presented in this case is entitled to your full and impartial consideration. It is necessary for the defendant to establish the defense of insanity by a preponderance of the evidence. To the commission of the crime of murder in the first degree mental capacity for deliberation and premeditation are essential. If the evidence shows that this essential capacity was *probably* wanting, or, if you believe from a preponderance of the evidence that the accused was insane when the homicide was committed; that at the time he was actuated by insane delusions, then there may be *reasonable and substantial doubt* of his capacity for deliberation and premeditation. If the homicide was committed in a manner that would be criminal and unlawful if the accused were sane, the verdict should nevertheless be not guilty, if the killing was the offspring or product of mental disease in the defendant."

The court here relaxed the rule somewhat, but it was decidedly in favor of the defendant, and should not be cause of complaint..

We think the law was fairly given to the jury on this defense, and we go now to the evidence relied upon to sustain it.

Is the verdict supported by the evidence as to this issue?

When the accused was nineteen years of age, he ran away from his home in Darke county, and came to this community. He changed his name by dropping his last name, Miller, and gave his name as Martin, Leon or Levi J. Martin, under which name he passed until about or near the time of his marriage, perhaps eighteen months prior to the homicide. He had told his employer and others he had no parents, brothers or sisters, or other relatives. He caused this impression and understanding to exist about eight or nine years, when he disclosed it to the woman he shortly afterwards married. Several years prior to his marriage he united with the Dunkard church of which a large membership existed in his neighborhood, and which was the church of his father and mother in Darke county, and he was taken into that church under his assumed name. Such papers as required his signature were signed by the assumed name, Martin, Leon, or Levi, or some other first name, and he was largely and generally known thereby. It appears that about two years prior to the homicide he had a dispute with his business partner, Ezra Smith, over a small difference of accounts, and the claim was left for suit, but was finally compromised with considerable bad blood between them, and accompanied with angry words toward each other. But while settled in law, it was not settled in fact, in the mind of the defendant, and he still felt that he had been wronged. At all times in his history he had been bashful or rather morose in disposition, but at the same time sensitive in his nature, and seemed to keenly feel any injustice done him. He told his intended wife of his deception, and on her advice went to visit his parents at the old home, and returned in a lighter mood. Under advice of a friend he confessed to his church the wrong he had done in concealing his identity, and thus the truth of this part of his life became known to his neighbors and acquaintances, and no doubt to his enemy, Ezra Smith.

He became impressed with the thought that he had been guilty of a heinous offense against his church and society, in what he had done and the life he had lived. As a member of the church, which seemed to be somewhat strict in its rules of conduct, the thought of the deception practiced weighed, no doubt, heavily upon his mind.

On the afternoon of the 23d of October, he stealthily assaulted

State of Ohio v. Levi Martin Miller.

Smith while he was at work in the field, which assault led to the attempted arrest and the homicide. It is said that he was despondent, melancholy, for sometime prior—frequently prayed aloud at his barn, and elsewhere—concluded his soul was lost; that everybody was against him, was laughing at him; that the community was against him, and his God was against him. By his own statement on the stand, he said that his assault on Smith was for the purpose of using him as he suspected others were intending to use him—castrating him. It is also evidence that after the trouble with Smith, he either fancied or feared that the newspapers had said something about him, and procured back numbers of some, and subscribed for others, to see if anything had been published concerning him.

On the afternoon after his attack on Smith he was informed by Sheidler, who came to the aid of Smith, that they would "attend to him later,"—meaning for drawing his revolver upon them. He saw them stop and converse with Souders, a near neighbor—supposed they were on the way to Tiffin for the officers, and went to Souder's home with gun in hand, and there expressed the belief that Smith had gone for the officers to arrest him. In his excitement or frenzy he there threatened, with drawn knife, to cut out the heart of Smith; to let the officers come, he was ready for them; and when reproved for the threat he had made, and admonished as to the duty of the officers, and his duty in regard thereto, that they would only come to do their duty, he used the threatening language, "Let them come, I am ready for them;" that he would die in his tracks; had not been shooting all summer for nothing; would shoot all the damned officers in the whole community. Here, too, after having been chided by Mr. and Mrs. Souders, he said his soul was lost; that he could not be saved now; he was a very devil.

This is a summary of the facts relied upon to establish insanity, or insane delusions.

What are the other facts in the case, He was a man of fair intelligence, of business capacity, and familiar with all of his business affairs. He was upright with his neighbors in the ordinary affairs of life. His memory was not in any way or at any time confused, up to the day of the homicide. We have heard of no case of paroxysm of passion. He had no delusion that anyone was seeking his life. To none of his intimate acquaintances during all these years did it occur that he was insane generally or partially.

He had contemplated a hunting trip to the west with a neighbor, and this fact is used to some extent to explain the amount of powder and number of guns found upon the premises.

His nearest neighbor and best friend never suspected insanity in any degree, although he was with him a good portion of each year. That afternoon, at Souder's house, he made a settlement with him of some business affairs, and later at his own house, settled with Souders the account of a neighbor, knowing the amount by memory, and then wrote an intelligent receipt for the payment made. This was not more than four hours before the homicide.

It is in evidence, and as bearing on this subject, that while in jail at Fremont, the defendant planned or contemplated means of escape by the use of a powerful acid upon the bars at the windows of the jail, and correspondence which he there had with another prisoner, letters which he admits he wrote, show that his mental faculties are far from being deranged.

He went on the witness stand in his own behalf as a witness. His evidence—ready comprehension of the questions put by his counsel, the long and searching examination in chief and the cross-examination, present him as more than the ordinary witness.

Aside from the opinions of medical men and neighbors, what might well be deduced from the foregoing facts?

He had capacity to reason, and had knowledge of right from wrong. He had not lost control of his will. He had the power of self-control. He could do or refuse to do, as seemed to him agreeable.

The jury might well conclude, in weighing all this evidence, that owing to his sensitive nature and theretofore bashful and modest disposition, Martin (or Miller), when the church and the public, and especially his enemy, Smith, came to the knowledge of his deception, his assumed name, etc., suspected and finally believed that he was the object of remark and jest at the hands of the people; that they were against him; that his offense was great against the church, and his thoughts and brooding over the subject led him to despair of his soul's salvation. In this spirit he might seek to see what newspapers had said of him. In short, he may have become sour at, and estranged from, the community, and he may have thought it was at war with him, and be so led to the point of recklessness, that he cared not what conflicts might arise between him and society or the officers of the law, and he might regard the officers of the law as representatives of the cause of his enemy, Smith.

What then? Is such a state of mind, insanity or insane delusion in law or in fact?

It is said in the case of *Farrar* v. *State*, 2 O. S., that mere moral insanity is no defense. In *Blackburn* v. *State*, 23 O. S., 146, our supreme court say:

"Where the defense of insanity is set up on the trial of an indictment for murder, it is not error to the prejudice of the accused to instruct the jury that the questions to be decided, as regards this defense, are these: 'Was the accused a free agent in forming the purpose to kill? Was he, at the time, capable of judging whether that act was right or wrong? And did he know at the time that it was an offense against the laws of God and man.'"

These tests were submitted by the court in this case. We cannot say the jury was wrong in finding that the defense of insanity, or insane delusion, was not made out. In fact, looking at the whole evidence in the record, we cannot see that the defense is supported by sufficient evidence; but it was a question for the jury on the hearing of the case upon the whole evidence.

This belief is strengthened when we consider another element of the case necessary to be proved beyond a reasonable doubt to sustain the charge of murder in the first degree, to-wit, deliberation and premeditation. And what we say here bears upon the entire transaction the night that the marshal was killed. Did the prisoner premeditate the killing and deliberate upon it? If so, it reflects upon his mental capacity as well as it fixes the higher degree of the crime. Especially is this true, if there is an absence of any provocation or excuse for his acts.

He had committed an assault upon Smith in the afternoon. He was informed that he would be attended to later. He saw Smith and Sheidler on the highway, and believed they were going to Tiffin to pro-

cure his arrest. He followed up to Souders with gun in his hand. He threatened Smith, as we noted before, and there declared to kill all the officers; he would die in his tracks; had not been shooting .all summer for nothing. He evidently then had his belt and knife and. revolver upon him. In this spirit he returned home. In the later evening, while Souders was at his house making the second settlement, he went to and looked out of the front window towards the road, seven or eight times. When the officers did come, and sought admission, he presented the gun at the door, and closed it. He took his place in the corner of the room with gun presented, when his wife let them in.

It was here, if not before, that the accused put himself in the wrong. He did not wait for the officers to put him in the wrong. He anticipated and expected them, and so, although his wife had retired, he remained in expectancy, fully armed with gun, revolver and knife, the latter two concealed under his blouse.

The marshal asked him. to put down his gun and was assured that he would not be harmed. He refused, and said once, perhaps twice, he would not be taken out of there alive. They were dressed as officers, and in fact we believe he knew they were officers who had come to arrest him.

To put him off his guard, no doubt, one of the officers informed him they did not want him; that they came to talk the matter over, and see what was the trouble—did not intend to arrest him. But he knew their purpose, and never for a moment let go of his gun, and kept it directed towards the marshal.

In this dilemma, was it required, or was it the duty of the marshal to inform Miller that he came to arrest him, or produce his warrant? The doing of either might have caused the death of both the marshal and Sweeney. It was the right of the marshal, when Miller knew of his mission, to first disarm him of his deadly weapon so the arrest could be made; then the nature of the arrest, its cause, and the warrant, if called for, follow. In attempting the arrest of one accused of crime, who is found expecting the officer and is armed with deadly weapons to resist arrest, it is the right of such officer to use necessary strategy to disarm the accused before producing the warrant.

Did not the accused do at least part of what he had declared to be his purpose? Was his act not the result of full and ample deliberation and premeditation?

It must be borne in mind that the officers did .not at any time assault plaintiff in error. They sought only to disarm him. He at no time doubted that their mission was to arrest him, for he did not put away his weapon when told that they did not want him, did not intend to arrest him. He did not change his attitude in the least, and it would have been the same had no such statement been made by the officers.

From the account given by Sweeney, Sheidler and Martin himself, his acts and conduct that fatal night were cool, calm and deliberate, and in no sense the result of excitement. He shot Schultz twice, and, as Sweeney went out of the door, fired at him, and no doubt would have continued had he not been overpowered by Sheidler. Then he expressed himself. "I will give up," says one. "You have got me," says another, and called to his wife to take Sheidler off, and called for his hat and coat, as they were about to take him away.

7 Dec. 36

The jury might well find that the killing was of deliberate and pre-meditated malice, and without just cause or provocation. Such is the conclusion warranted by the evidence. It may have been the act of a desperate and reckless man, but of one who is responsible at law. His moral senses may have been blunted, benumbed, or perverted for the time being, but such is the case in almost every homicide, and there is scarcely an instance of such crime in which we cannot find scars on the moral nature and defects in the mental organization.

There is another part of the charge of the court which was excepted to at the trial.

The defense introduced expert witnesses on the subject of insanity. The state did likewise. Hypothetical questions were propounded and answers made to such questions. Non-experts, neighbors and acquain-tances of the defendant were examined as to their knowledge of the man, and gave their opinions as to his sanity. Some of these witnesses quali-fied under the rule of in Ohio, but the grounds for their opinions in some instances were slight. In some cases the hypothetical question did not embrace all the facts developed in the case.

The court charged the jury on this class of testimony, and told them to receive such evidence with caution, and this admonition occurred twice in this branch of the charge. It was doubtless thought by counsel for the defendant that the court gave this caution too much prominence, and that it might have lessened the weight which such opinions might have with the jury. But the instruction of the court applied to both sides, and the character of the evidence *pro* and *con*, furnished good reason for the caution suggested.

In the case of *Harrington* v. *State*, 19 O. S., 270, the supreme court say:

"Instructions advising the jury of the object for which particular items of evidence are admitted, and cautioning them against being misled by their improper use, are certainly proper, and are often called for by the circumstances of the case; but the instructions ought to be so given as neither to withdraw the evidence from their consideration, nor to restrain them from giving to it, in connection with the other evidence in the case, such weight in respect to the matter which it tends to prove, as, in the light of reason and good sense, they may, as thus advised, believe it to deserve."

We think the court kept within the rule here laid down and com-mitted no error.

The charge covered every aspect of the case carefully and fully, and defined clearly the various degrees of homicide and the elements necessary to be present to establish each of the several degrees.

We find no error in the charge, and that the requests were properly modified and given.

There were exceptions taken to the introduction of testimony by the state, such as producing the clothes of the dead marshal, the gun, re-volver, in the presence of the jury—questions concerning the amount of blood on the floor at the undertaker's, etc.

The articles of clothing mentioned were not put in evidence, nor were the gun and revolver. They were properly present for inspection of the witness, so as to explain his evidence.

Taking the whole record, we find no substantial error in the intro-duction of the testimony on either side. In fact, the case was ably pros-

ecuted, and the defense conducted with signal ability, so that all the facts were brought before the jury, and under the law as administered by the court, the prisoner had a full and fair trial.

It is proper here to remark that among the files of this case we find a supplement to the motion for a new trial, in which it is said that before the charge of the court, and before the verdict was rendered, and while the prosecuting attorney was making his argument, the sheriff called out Company "E" of the Second Regiment of Ohio National Guards, and that these guards were on duty and stationed in and about the county jail and court house, which continued during the deliberation of the jury, all of which was known to the jurors.

This, we say, is the language of the supplemental motion, and if the record disclosed that the statements made in it are true, if such facts appeared in the bill of exceptions as the truth of the case, we would be unanimous in reversing the judgment, for a verdict under such surroundings might be greatly influenced by the act of the sheriff. But the position seems to have been abandomed, and there is nothing whatever said about it in the bill of exceptions.

The judgment is affirmed, and cause remanded for execution of sentence.

DAY, J., dissenting, holds: that, while there was no error committed during the trial, and the charge of the court was in main correct, yet the court did not fully and sufficiently instruct the jury as to the degree of proof on the defense of insanity, when applied to the question of deliberation and premeditation, and that defendant's request on this subject was unduly modified.

*J. C. Royer* and *McCauley & Weller*, for Plaintiff in Error.

*Geo. E. Schroth*, for the State.