## KELLY *v.* RUBLE, ET AL.

VENDOR'S LIEN.—A vendor's lien on real restate cannot be set up by an apparent stranger to the transaction of sale, who claims to have had parol contracts for sale with the grantors, and that the conveyances to the defendant were made through the instrumentality of the plaintiff as the virtual owner.

SEMBLE.—That in this state the vendor of real estate by an absolute deed, has no lien thereon for the unpaid purchase money.

APPEAL from Jackson County.

*Geo. H. Williams,* for appellant.

*P. P. Prim, and Bonham & Ramsey,* for respondent.

This is an appeal from a decree establishing a vendor's lien in favor of respondent against certain mining claims on Coyote creek, Jackson county, Oregon, the title to which is in appellants.

The issues are contained in an amended complaint, answer and reply. There were quite a number of defendants, but none of them answered except the appellants, the decree as to the others being for want of answer.

The case stated in the amended complaint is in substance as follows:

That on and prior to April 1, 1878, plaintiff and O. Jacobs owned in fee as tenants in common, certain mining land on Coyote creek, and that at the same time Ash & McWilliams, O'Shea, John Robertson, D. F. Matthews, and Davis & Rathburn owned respectively certain other mining claims adjacent thereto, all of which claims are particularly described by metes and bounds, in the complaint.

That prior to said date all of said claims not owned by plaintiff were "bonded" to him by written agreements with

the owners thereof, except the Ash & McWilliam's claims as to which there was a verbal agreement, whereby he had the refusal and option to purchase said claims, with the water rights, ditches and other appurtenances, from said owners thereof within an agreed period of time. That while said agreements were in full force, plaintiff entered into a written contract for the sale thereof, to one Muncy, of which the following is a copy:

Know all men by these presents, that H. Kelly of the county of Jackson, in the state of Oregon, party of the first part, and I. N. Muncy of the county of Douglas, of the above state, party of the second part, agree as follows, to-wit: "That the said Kelly binds himself, his heirs and assigns to make and deliver to the said Muncy or his assigns, a good and sufficient warranty deed of all the mineral ground situated on Coyote creek in the said county of Jackson, that is now patented to O. Jacobs and Kelly; also a good and sufficient deed for the right of possession of all the mining claims on said creek, commencing from the lower end of the mining claim owned by F. A. Davis, and extending to the upper end of the claims now owned by McWilliams & Co., and all houses, ditches, water rights, flumes and hydraulics belonging thereto. The conditions of the above bond are that if said Muncy or his heirs or assigns, shall pay or tender to the said Kelly, his heirs or assigns, the sum of $30,000 in gold coin of the U. S., or notes accepted by the said Kelly as follows: Ten thousand dollars ($10,000) in three weeks; ten thousand dollars in two months, and ten thousand dollars in four months from the date of this bond, then the above bond to remain in full force and effect, otherwise to be void.

Dated at Canyonville, Oregon, this first day of July, 1878.

H. KELLY. [SEAL]."

That the mining claims referred to in this bond are the same as those described by metes and bounds in the complaint, and other claims known as the Marshall claims.

That about August 15, 1878, Wm. Ruble assumed said contract evidenced by said bond, and undertook jointly with Muncy and severally for himself to carry it out and to take said property and pay plaintiff therefor according to its terms.

That this contract was subsequently and prior to August 27, 1878, so modified by mutual consent of plaintiff, Muncy and Ruble, as to exclude the Marshall claim, and to reduce the purchase price to $27,000.

That prior to August 27, 1878, Muncy, in pursuance of said contract, and for the purpose of raising said $27,000, procured the following paper writing to be drawn and subscribed by the persons whose names appear thereto:

"Know all men by these presents, that we the undersigned subscribers to stock in a certain gravel mine, situated on Coyote creek in the counties of Jackson and Josephine, in the state of Oregon, agree to pay to I. N. Muncy, fifty per cent. of the capital value for each and every share set opposite our names, as follows: Twenty-five per cent. in hand, and twenty-five per cent. when taken out of the mine over and above expenses.

That said mine is to be divided into two hundred thousand shares, of the par value of one dollar each, in gold coin of the United States.

It being understood and agreed that each and every subscriber is to have one-half of the net proceeds of the mine *pro rata*, to the whole amount of the capital stock, until his stock shall be paid in full in said coin as above mentioned, then he is to receive the amount of stock for which

he has subscribed, free from all incumbrances, and full dividends thereafter upon said stock.  It being further agreed and understood that the said Muncy is to, at its own expense, extend the ditch known as the McWilliam & Co. ditch, down the said creek to a point on the hill above a claim known as the Robertson claim, and to purchase and place upon said mine another pipe fifteen inches in diameter, and of sufficient length for the successful working of said mine, together with a giant and flume corresponding to the same.

| NAMES OF SUBSCRIBERS. | AMOUNT OF STOCK. |
|---|---|
| Paid in full $1,000, H. Kelly | 1000 |
| Paid        D. Stump | 5000 |
| Paid $20, E. A. Chase | 1000 |
| Paid $1,500, J. L. Murphy, first payment full | 7500 |
| Paid $25, A. Cloak | 100 |
| Paid $500, J. F. Bewley, first payment full | 2000 |
| Paid 50 cents, Eddie Faulconer, first payment full, | 2 |
| Paid 25 cents, Frank Lucas, first payment full | 1 |
| Paid 50 cents, Fred Lucas, first payment full | 2 |
| Paid $1.25, Elizabeth Hoper, first payment full | 5 |
| Paid 25 cents, Curtis M. Hooper, first payment full | 1 |
| Paid $25, D. M. Calbreath, first payment full | 100 |
| Paid by note $10, S. W. Sloper, first payment full | 40 |
| Paid $25, W. F. Lemon | 100 |
| Paid $250, Reuben Doty | 2000 |
| Paid $150, J. H. Ray | 1000 |
| Geo. Dyer | 2000 |
| B. F. Dyer | 2000 |
| T. S. Rodabough | 5000 |
| Paid $9,550, as per arrangement, Wm. Ruble | 50,000 |

That it was understood by and between said subscribers, that Muncy, as their representative, and, representing a com-

pany to be formed, would secure to them through said contract between himself, plaintiff and Ruble, the said mining grounds and claims and appurtenances, which was the purpose of those executing said writing, it being agreed among them that each share should represent a 1-200,000 undivided interest in said mines.

That to carry out said scheme, Ruble, Muncy, Stump, and Murphy, on August 27, 1878, incorporated the "Coyote Gold and Silver Mining Company," which was done at the instance and advice of Ruble by articles, a copy of which is made "Exhibit C" to the complaint.

That Ruble, on August 27, 1878, purchased the shares subscribed by him, 50,000 of Muncy, agreeing to pay $10,-000, seven thousand cash, three thousand on or before November 1, 1878, and $12,500 when realized out of one-half of the net proceeds of his one-fourth interest in said mine.

That it was agreed between Ruble, Stump, Murphy, and Muncy acting for himself and said other subscribers, that Ruble should, in pursuance of said contract between him, Muncy and plaintiff, purchase said mining property and take the title in the name of said company or in his, Ruble's name, in trust and for the use of said company, and it was known to said incorporators and subscribers at the time of said incorporation, and at all times thereafter, that plaintiff had not been paid in full for said property and had a vendor's lien thereon for said unpaid balance of the purchase price.

That in pursuance of said contract and arrangement, plaintiff on September 2, 1878, caused and procured Davis and Rathburn to convey their mining ground to Ruble who paid $2,000 therefor, and on September 4, 1878, plaintiff caused and procured O'Shea to convey to Ruble his mining ground, and Ruble paid $2,550, and conveyed to plaintiff a

half interest in the Murphy farm valued at $750, and on the same day plaintiff caused and procured Robertson to convey his claim to Ruble who paid $1,000, and on the same day paid plaintiff $500 and conveyed to him the other half of the Murphy farm, all of which conveyances were made in pursuance of said contract between Kelly and Muncy and Ruble, and with the understanding that Ruble was taking the title thereto in trust and for the use and benefit of said company.

That defendant, Wm. Ruble, as the agent of said company, did on the 4th day of September, 1878, further promise and agree to pay Ash and McWilliams for plaintiff, on account of said contract of said Muncy with plaintiff, the further sum of $4,000, and the balance of said $27,000 so to be paid on said contract, and the plaintiff therefor, and in consideration thereof, caused the said Ash and McWilliams to make out their deed to the said Ruble for their said property, which was bonded to Kelly as above mentioned, and relying upon Ruble's promise to pay said balance of $11,664 25 within a short time thereafter, plaintiff, on December 6, 1878, caused to be conveyed to said company the balance of said mining claims, and surrender to it the whole thereof. That the $1,000 subscribed by plaintiff has been credited as part payment of said $27,000. That there is due plaintiff said balance of $11,664 25 with interest at 10 per cent. from December 6, 1878, on which day an accounting was had between him and defendants, and said balance found due him. That after the corporation of said company, various other persons (whose names are given,) subscribed for shares in said mine, agreeing to pay therefor as set forth in the complaint, all with Ruble's knowledge and consent, and upon the understanding that he was holding

the title to the lands so conveyed to him in trust for said company.

That about November 27, 1878, Wm. Ruble, without consideration, and with intent to defraud said company and said subscribers, and to defraud plaintiff out of said unpaid balance of purchase money due him, conveyed the Davis and Rathbone and Robertson claims to defendant Walter Ruble, who had, at the time he accepted said conveyance, full knowledge of all the above facts, and that for like fraudulent purposes Walter Ruble on May 20, 1880, without consideration conveyed the same to defendant, Ruth Ruble, who well knew the above facts when she took said deed. That by the acts of Wm. Ruble, in taking possession of and claiming to own the portion of said mining ground conveyed to said company as above stated, the same is rendered almost valueless and will not sell for enough to pay said balance of purchase money due plaintiff.

Wherefore plaintiff prays that said deeds to Walter and Ruth Ruble be decreed to be fraudulent and void and be canceled, and that his vendor's lien for said unpaid balance of purchase money due him, with interest as aforesaid, be foreclosed, and said property sold to satisfy the same, etc.

A large portion of the answer, consisting of some 22 so-called separate answers, was stricken out on motion. As left standing, that pleading in substance is as follows:

Specific denials of a large majority of the allegations of the complaint, but admitting that the contract between plaintiff and Muncy is correctly copied as above set forth; denying, however, that Wm. Ruble assumed or became a party thereto. Also admitting that the copy of subscription agreement is correctly set forth, but denying the legal effect claimed for it in the complaint, or that it was executed upon the understanding, or for the purposes claimed

by plaintiff, and alleging that the words "Paid $9,550" connected with Ruble's signature and subscription thereto, were placed there long after he signed, and without his knowledge or consent, and denying that he ever paid one cent to Muncy or any one else on said subscription. Denies that it was understood by or among said subscribers that each share should represent a 1-200,000 part or any interest in said mining ground. Denies that Wm. Ruble took said conveyances of said mining claims or any of them to himself in trust or for the use or benefit of said subscribers or of said company, or in pursuance of said contract between plaintiff and Muncy, or of said subscription agreement, or upon any understanding or agreement that said deeds were made to him as agent or representative of said company or of said subscribers.

Admits the conveyance to Wm. Ruble of the Davis and Rathbone, O'Shea and Robertson claims by the respective owners thereof, and the payment of the amounts of money specified in the complaint therefor, at the times alleged by the plaintiff, and also the conveyance by Ash and McWilliams of their claims to said company, and the payment of $4,000 by Ruble therefor, but denies that said conveyances to Ruble, or any of them, were in trust for said company, and alleges that all of said money paid for said claims was Ruble's own money, and denies that Ruble agreed to pay plaintiff any balance of $27,000. Admits the payment by Muncy to plaintiff of the $2,285 75, and the payment by Stump to plaintiff of $500, but denies that either payment was made upon, or on account of, or because of said contract between Muncy and plaintiff, or of said subscription agreement, and denies that Wm. Ruble promised or agreed to carry out said contract between Muncy and plaintiff, or became a party thereto, or that plaintiff relied on

any such promise, agreement or understanding. It is denied that plaintiff caused and procured said conveyances to be executed to Wm. Ruble and to said company in pursuance of any such contract, agreement or understanding as alleged in the complaint, but it is not denied that plaintiff did cause and procure said deeds to be executed to Ruble and the company, and is admitted that the sums of money alleged in the complaint to have been paid to plaintiff therefor at the delivery of said deeds were so paid. Admits the incorporation of said company by articles copied as exhibit to complaint, and that Wm. Ruble was one of the incorporators thereof. Denies the surrender of possession of said mining claims by plaintiff to said company. Admits that Ruble received $500 from Stump and paid it to Mathews, but denies that any other subscriber to said agreement furnished any money to pay for any property described in the complaint. Denies that any accounting was ever had between plaintiff and defendants, or that $11,664 25 or any part thereof was found due to plaintiff, or is now due to him, and denies any promise or agreement on the part of Ruble or the company to pay the same or any part thereof. Denies knowledge on the part of said incorporators or subscribers that any balance was or is due plaintiff, or that he had or has any vendor's lien therefor upon any of said property. Admits the subscription subsequent to incorporation by the various persons named in the complaint for the amounts there stated, but denies they were made or paid with the understanding that the company owned said mines. Denies knowledge, etc., as to whether plaintiff paid the $1,000 subscribed by him, or credited same on purchase price of any of said mining claims. Denies that Wm. Ruble wrongfully or fraudulently took or holds possession of any of said property, or wrongfully or fraudulently, or

without consideration, conveyed the property to Walter Ruble. Denies that Walter Ruble knew that said property belonged to said company when he received said conveyance from Wm. Ruble. Denies that the deed from Walter to Ruth Ruble was wrongful, fraudulent, or without consideration, or that she knew the property thereby conveyed belonged to said company. Denies that Wm. Ruble's possession of said property conveyed to the company has depreciated the value thereof. Admits the conveyance by plaintiff on December 6, 1878, of the O. Jacobs, Kelly and Mathews claims to the company, and that said corporation paid plaintiff in cash, notes and property about $6,000, and that prior to the commencement of this suit, said corporation paid plaintiff 90,000 shares of its stock, marked paid in full, which was received by plaintiff in full satisfaction of all demands against said company.

The reply denies all of the affirmative allegations of the answer.

By the Court, Waldo, J.:

The complaint alleges that on the first day of July, 1878, the respondent bound himself by an agreement in writing to convey to I. N. Muncy, for $30,000, to be paid in installments of $10,000 in two weeks, two months and four months, seven mining claims in Jackson county, Oregon.

The respondent owned but one of these claims, but contracts to convey to him are alleged to have existed between him and the owners. Some of these contracts are shown to have been verbal, and in the others the writings have not been produced. They must, therefore, all be held to stand on the same footing of verbal contracts, void under the statute of frauds. The complaint, as stated in respondent's brief, goes on to allege that Ruble in conjunction with

Muncy and severally for himself—what that may mean no one has tried to explain—assumed said contract and undertook to carry it out, and to take said property from respondent. Now there was no contract on Muncy's part to be assumed. The contract was unilateral. (*Hawralty* v. *Warren*, 17 N. J. Eq., 124.) Muncy had an option to purchase and if he turned that option over to Ruble, Ruble would have an option and nothing more. If Ruble became bound he became so wholly by subsequent transactions. Then, after Ruble had assumed, as is alleged, the so-called Muncy contract, it is next alleged that the contract was afterward modified so as to exclude the Marshal claim and reduce the purchase price to $27,000. This modification was oral and, therefore, void. (*Dana* v. *Hancock*, 30 Vt., 616; *Abell* v. *Munson*, 18 Mich., 306.)

The next allegation is that Muncy and Ruble undertook to raise the $27,000, for which the contract called, and we are introduced to the subscription paper, by which it appears that Muncy—not Muncy and Ruble—undertook to figure in the character of vendor of these claims and to sell them to third parties for $100,000. The method adopted was to endeavor to form a company and issue stock, out of the proceeds of the sale of which Muncy was to be paid $100,000, and to make over the property to the company. In furtherance of this project, it is alleged that on the 27th day of August, 1878, Ruble, Muncy, Stump and Murphy incorporated the Coyote Gold and Silver Mining Company; and Ruble is alleged then and there, although the articles of incorporation had not yet been filed and were not filed in Jackson county until the 6th of September, to have purchased of Muncy, acting as agent for the company, 50,000 shares of stock, and to have agreed to pay Muncy therefor the sum of $25,000; $7,000 in hand and the balance in in-

stallments. What authority Muncy had to act as agent for the corporation and sell its stock to Ruble is one of the mysteries of this remarkable complaint. At this time there was neither stock nor company in existence. (See *Mokelumne Hill M. & C. Co.* v. *Woodbury*, 14 Cal., 424.) So far as the complaint affirmatively shows, Ruble rests under the burden of this debt to this day. There is not a word more about the indebtedness to Muncy.

The corporation which is alleged to have been organized for the purpose of taking and holding the property for the benefit of the subscribers to the Muncy subscription paper, seems to have forgotten the purpose of its creation. But it is alleged that the incorporators agreed among themselves that Ruble should "proceed to Coyote creek, in Jackson county, and make payments on account of said Muncy and Ruble contract with the plaintiff for the purchase of said mining claims and take the title for the same in the name of the company or in his own name, but it was agreed between said parties as aforesaid that if taken in his own name the said title should be held by said Ruble in trust for the use and benefit of the company." The transaction thus alleged has much the appearance of having been a transaction between third parties—*res inter alios acta.*

It is then alleged that Ruble went to Jackson county in pursuance of said agreement, and for the purpose of purchasing said mines for said company, and represented to respondent that he was the agent for said company and authorized to make payments for said company to respondent and to take title in his own name for the use and benefit of said company, and that respondent, relying on said representations, did, on the 2d day of September, 1878, cause the Davis & Rathburn claim to be conveyed to Ruble,

followed, on the 4th of September, by conveyances of the O'Shea and Rathburn claims.

How does the case, as thus far stated, stand? The claim is, that Ruble acted as agent and purchased these claims for the Coyote Gold and Silver Mining Company, and holds them in trust for that corporation. This cannot possibly be true as matter of law. The respondent was bound to take notice that the articles of incorporation had not been filed. When Ruble purchased, the corporation had no legal existence. Ruble could not have been an agent, for there was no principal. He could not have been a trustee, for there was no *cestue que trust*. If the promise was made to Muncy, Stump and Murphy for the benefit of the corporation, it was void, not only under the statute of frauds, but for want of consideration. As a contract, it would have been one to which the respondent was a stranger. But suppose the corporation to have been in existence and that the promise was made directly to the corporation, Ruble paid his own money and his promise to buy and hold in trust for the corporation would have been directly in the teeth of the statute of frauds. (2 Sugden on Vendors, 8 Am. Ed., 438.) Hence, even if Ruble had been actually the agent of the corporation and had undertaken to purchase the property for the corporation, no title would have vested in the corporation on account of the purchases made on the 2d and 4th of September. Some other ground must be found, then, on which to assert a title to this property in the corporation. This ground is supposed to be found in the representations Ruble is alleged to have made to the respondent, that he was purchasing for the corporation. In other words, Ruble is estopped by those alleged representations to deny the title of the corporation. But the corporation was a stranger to the alleged representations, and can neither take

advantage of, nor be bound by them. (*Averill* v. *Wilson*, 4 Barb., 180; *Wood* v. *Bennell*, 51 Me., 52; 32 Pa. St., 49.) No trust can arise in favor of the corporation because of those alleged representations to the respondent. (*Blyholder* v. *Gilson*, 18 Pa. St., 135.)

Ruble is not charged to have purchased for himself. There is an insurmountable difficulty in so charging him, because the contract is alleged to have been entire and Ruble purchased only a part. An end, then, would seem to have been reached in the attempt to establish a vendor's lien on the property held by Ruble. But this apparently irremediable defect at the threshold of the respondent's case, has been supplied in the following extraordinary manner: Ruble and the corporation are both defendants in the suit and between them they own the whole of the property. They can not be charged severally, because the contract was entire. There was but one vendee and one sale. This sale was made to the corporation and a portion of the property conveyed to Ruble as trustee. But, unfortunately, the corporation can assert no title to the property held by Ruble. The equitable as well as legal title is wholly in Ruble. How, then, is the trust to be established? The respondent solves the difficulty as follows: Ruble, as he alleges, represented to the respondent that he was purchasing the property for the corporation, and the respondent believed those representations and sold to Ruble believing that he was selling to the corporation. It must be admitted that those alleged representations gave the company no title to the property so purchased. But the respondent is entitled to consider that those representations were true, and that while Ruble is not estopped to deny, as against the corporation, that the property he holds is equitably its property, he is, nevertheless, estopped to deny this as against the respondent. That

while the property does not belong to the corporation, within any legal definition of the word property, the respondent has such peculiar relations to it that he may levy on and sell it at execution sale to satisfy a debt against the corporation. The result is most extraordinary. Ruble and the corporation are consolidated into a centaur-like figure— half man—half corporation. Ruble's existence as a natural person is so far destroyed by merger in the corporation that a sale to him instantly vests the title in the corporation. There is, according to the respondent's views, no distinction, in legal effect, between Ruble and the Coyote Gold and Silver Mining Company. They are the same. But Ruble claims to be a private person entitled to the benefit of the laws of private property. The property of one person cannot by the laws of this country be taken to pay the debt of another. Yet this is precisely what the respondent is attempting to do. The corporation, which is sued directly as the purchaser of the property and debtor to the respondent for the purchase money, has not a shadow of title to the property held by Ruble. Hence, had the corporation made defense, the debt which the suit is brought to enforce would have been shown to have no existence, and, consequently, the respondent's suit would have failed. But the corporation makes default. This, however, cannot affect Ruble. Ruble can attack the respondent's case as the corporation could have attacked it, and show that the corporation has no title to the property, and, consequently, that he cannot be a trustee. In any other view, the circumstance of making default or making defense on the part of the corporation would determine the question of Ruble's liability. But Ruble claims adversely and his rights cannot depend on any such principle. The alleged representations to respondent had no effect on the title of

the corporation, and there is no other title in controversy. The respondent asserts rights against Ruble not independently of, but through the corporation, and his case fails when he fails to make out title in the corporation.

Next, when we come to the transfer of the Ash & Mc-Williams claim, we find facts impossible to reconcile with the transaction of an entire sale set up by the respondent. The Davis & Rathburn claim was conveyed on the 2d of September, and, since the contract was entire, the contract for the sale of the whole of the property should have been made by that time. Now, it cannot be denied that the respondent's contract with Ash & McWilliams was void under the statute of frauds. Hence, the respondent had not, equitably, sold that claim on the 2d of September when the Davis & Rathburn claim was conveyed. Ash & McWilliams were the absolute owners after that time and could have sold to any one with full notice of the void contract and conveyed a perfect title. There were neither legal nor equitable rights in respondent of which to take notice. On what ground, then, can the respondent claim to have been the vendor of that claim on an entire contract? Suppose that Ruble, after his purchase of the Davis & Rathburn claim on the 2d of September, had conveyed that claim to one with full notice of the void oral agreement. Would not the purchaser have acquired a good title to the claim? This shows that when the Davis & Rathburn claim was conveyed, no sale of the Ash & McWilliams claim had taken place. In what condition was the alleged vendor's lien on the Davis & Rathburn claim prior to the subsequent conveyances? If the other claims were sold under the same contract with the Davis & Rathburn claim, they must have been sold by the 2d of September. If they were sold after

that time, it severs the entirety of the contract and is fatal to the respondent's case.

But how can the respondent avoid the statute of frauds which stares him in the face in every one of these transactions. There cannot be a case in the books entitled to a moment's consideration that will sanction such an inroad on the statute of frauds as is attempted in this case. There is not a single act or circumstance in connection with the alleged part performance to stand as a safeguard against perjury. The oral agreement was as invalid in equity as at law. Earl, J., *Wheeler* v. *Reynolds*, 66 N. Y., 236. Where the agreement has been partly performed, equity interferes to prevent fraud. *Id.*, 236; *Playmale* v. *Comstock*, 9 Or., 321. The act of part performance must be clearly proved, and to do this it is essential that the act itself must be such that it cannot be consistently explained except on the supposition of an agreement. *Brewer* v. *Wilson*, 17 N. Y. Eq., 180; *Bunton* v. *Smith*, 40 N. H., 353; *Charpiat* v. *Sigeron*, 25 Mo., 63; *Knoll* v. *Harvey*, 19 Wis., 99; *Wheeler* v. *Reynolds*, 66 N. Y., 231; *Peckham* v. *Barker*, 8 R. I., 22; *Purcell* v. *Minor*, 4 Wall., 513.

What presumption can be raised from the fact that Ash & McWilliams deeded their claim to Ruble, that there was an agreement for its sale between respondent and Ruble; it appears on its face to have been a sale made by Ash & McWilliams to Ruble, and when it is shown that Ruble paid the purchase price to them out of his own money, and, as he swears, for his own benefit, parol testimony cannot be heard to the contrary. The act which is set up to establish part performance must itself furnish some evidence of the alleged agreement without the aid of parol testimony. Such testimony alone cannot establish part performance. *Samms* v. *Worthington*, 38 Md., 326–7, cited in Waterman

on Specific Performance, § 261; *Harris* v. *Knickerbocker*, 5 Wen., 645; *Armstrong* v. *Katterhorn*, 11 Ohio, 264; *Danforth* v. *Lancy*, 28 Ala., 274; *Wilson* v. *Wilson*, 6 Mich., 9; *German* v. *Mackin*, 6 Pa., 293; *Ham* v. *Goodrich*, 33 N. H., 32; *Jones* v. *Peterman*, 3 S. & R., 543; S. C. 8 Am. Dec., 672. If the proposition advanced by the respondent was true, no sale of real estate could take place against which a vendor's lien could not be established wholly by parol testimony by collusion between the grantor and alleged vendor.

It follows that, admit the facts to be as alleged, and they fail as matter of law to show that the respondent was the vendor of these claims. They show, on the contrary, that he was not.

As the respondent has failed to make out a sale, it becomes unnecessary to consider the case further. We have thus far impliedly admitted the existence of the equitable lien of a vendor of real estate for the unpaid purchase price. But we doubt the actual existence of the lien in this state. *Ahrend* v. *Odiorne*, 118 Mass., 261; *Kauffert* v. *Bower*, 7 S. & R., 64, 76. It is not believed the existence of such lien was decided in *Pease* v. *Kelly*, 3 Or.

Judgment reversed and restitution of the property ordered.

WATSON, C. J., dissenting:

It is with sincere regret that I find myself compelled to dissent from the opinion of the majority of the court in this case, but I do not feel at liberty to adopt a different course. The criticisms upon the complaint, which appear in the opinion, in my judgment require no answer. The sufficiency of that pleading is virtually conceded throughout the arguments upon which the opinion is based. It is the insufficiency of the facts, and not any mere deficiency in the

mode of their allegation that is adjudged. The facts upon which Kelly relies are fully stated. If they entitle him to no relief, the fault is not in his pleading, but in his case itself. Nor will it be necessary to pay any portion of the evidence more than a passing attention, since the opinion proceeds wholly upon the assumption that the facts alleged by Kelly are established by the proofs so far as they are capable of being established by the kind of proofs introduced for the purpose.

The facts are that Kelly, holding an undivided one-half interest in certain placer mining ground and ditches and water rights connected therewith, known as the "Kelly & Jacobs claim," situated on Coyote creek, Jackson county, Oregon, and being in possession with full power to sell and dispose of the entire property on his own account, about the month of April, 1878, entered into agreements with Davis & Rathburn, John W. Robertson, Daniel F. Mathews, P. H. O'Shea, and Ash & McWilliams respectively, for the purchase of their several placer mining claims, ditches and water rights, on the same creek, and adjacent to the "Kelly & Jacobs claim." A definite price was fixed upon in each instance, and a time within which payment was to be made. All the agreements were in writing except the one with Ash & McWilliams. Kelly's plan was to consolidate all the mining ground, ditches and water rights on the creek, under one ownership and management, and dispose of the whole in a body, with the expectation of deriving substantial benefits from the transaction. Accordingly, on July 1, 1878, he gave I. N. Muncy his written obligation under seal to convey the entire property, together with some other property on the creek known as the "Marshall claim"—for which he then had no agreement with the owner, but anticipated procuring one—to Muncy or his assigns for the

8

consideration of $30,000, payable in three equal install-
ments, three weeks, two months, and four months, respect-
ively, from date. Afterwards he found that he could not
get the "Marshall claim," and by verbal agreement of all
parties interested, the "Marshall claim" was excluded, and
the price for the remainder settled at the sum of $27,000.

Upon the basis of his rights under this agreement, Muncy
proceeded at once to solicit the co-operation of others in
making the stipulated payments and securing the property.
His plan was to form a company to take the property; and
raise the money to pay for it on subscriptions for its capital
stock. A paper, known in this case as the "Muncy Subscrip-
tion" was drawn up for the purpose. Two hundred thousand
shares of capital stock were to be issued. Muncy was to re-
ceive fifty cents upon each share subscribed—twenty-five
cents down, and twenty-five cents more when taken out of the
mine, above expenses. For this consideration Muncy was
to secure the property for the subscribers, and place certain
improvements and appliances upon it. The subscribers
upon the full payment of the fifty per centum, in the man-
ner prescribed, were to receive paid up stock, to the number
of shares subscribed by them respectively. It is very plain
from the terms of this paper, in connection with the subse-
quent conduct of the subscribers thereto, that while no com-
pany was named therein, subscriptions upon it were under-
stood and intended by the subscribers as subscriptions to
the capital stock of a company proposed to be formed at
some future time. The form of the proposed association
does not seem to have been very definitely settled at first;
but that all looked forward to an organization of some kind,
conforming to the wishes of the subscribers thereafter to be
ascertained, appears to admit of no doubt whatever. Ruble
became interested with Muncy in this project about the

middle of August, 1878. That he fully understood Muncy's arrangement with Kelly, and his plans in relation thereto is unquestionable. In promoting the success of this scheme, he was more active and effective, and more interested than any other participant, unless it was Muncy himself. On the 22d or 23d of August, 1878, accórding to his own testimony, he made an arrangement with Muncy to take a one-fourth interest. He was to pay Muncy $5,000 down, $2,000 more as soon as he could dispose of his wheat crop for that year, and $3,000 more when taken out of the mine to his share. This arrangement was verbal. On the very next day, he went to see David H. Stump and John L. Murphy, and agreed with them to incorporate a company to take the property on the terms of Kelly's obligation to Muncy. He also notified Muncy of their determination. Pursuant to such agreement and notice, Ruble, Stump, Murphy and Muncy met together in the Commercial Hotel at Salem, on August 27, 1878, and subscribed and acknowledged the articles of incorporation of the Coyote Gold and Silver Mining Company. At this meeting, Stump subscribed the "Muncy Subscription" paper for 5,000 shares of stock; Murphy subscribed it for 7,500 shares; and either at this time or on the morning of August 30, 1878, Ruble subscribed it for 50,000 shares, annexing the words *"as per arrangement,"* to connect such subscription with the previous parol arrangement between himself and Muncy of the 22d or 23d of the same month, already alluded to. At this meeting, on August 27, 1878, it was agreed among the four incorporators, Ruble, Stump, Murphy and Muncy, that Ruble should take all the money that might be advanced on the subscriptions, out to Canyonville, and pay it to Kelly there on the purchase of the property from him, and take title to such portion of it as Kelly might cause to be

conveyed, either in the name of the Coyote company, or in his own name as trustee for the company. In the latter case, he was to hold the title thus conveyed to him until the company should be better organized, and then convey to it. Murphy had already executed a deed of his farm valued at $1,500 under an arrangement with Kelly that it should be accepted as a payment of that amount on the purchase; Stump gave Ruble $500; and Ruble took about $5,000 of his own money, and started from Salem on August 30, 1878, for Canyonville, where he arrived on the following day. The next day—September 1st—he met Kelly, who had come in from the mines, some 30 miles further south, pursuant to a telegram from Muncy, notifying him of Ruble's visit. Ruble then informed Kelly of the incorporation of the Coyote company, of what had been done, and the arrangement in regard to making payments and taking title.

A letter from Muncy received at the same time fully confirmed Ruble's statements, and Kelly, acting under the belief induced by such representations, took Ruble out to the mines and caused all the owners of the adjacent property with whom he had agreements, except Mathews, to make conveyances directly to Ruble, as trustee for the Coyote company. Mathews had previously conveyed his property in compliance with his agreement; and on the 6th day of the following December, Kelly conveyed this property, together with the "Kelly & Jacobs claim," directly to the company in fulfillment of his contract. The conveyances to Ruble were made by the respective owners at Kelly's request, and as a performance of their previous agreements with Kelly to convey to him. Kelly made out the deeds and defrayed all the expenses attending their execution, including the expense of taking Ruble out to the mines from Canyonville. With the exception of $500, Ruble did not

pay the money directly into Kelly's hands, but paid to each owner respectively when he executed his deed the amount due him under his previous agreement with Kelly. Kelly was present in each instance, counted the money, and saw that each one got just what he had agreed to pay him for his property. The money was, however, paid for Kelly, as part of the price due him for the entire property, upon the terms of his obligation to Muncy, and as money advanced for the Coyote company by the subscribers for its stock as already described. And such was the understanding and intention of all the parties to the transaction at the time. These payments were in legal effect part payments by the Coyote company to Kelly on the price he was to get for the entire property, and full payments by Kelly to the owners of the property of the prices he was to pay them respectively under his previous agreements with them. These deeds were executed on the 2d and 4th days of September, 1878, and while upon their faces they purport to be absolute conveyances to Ruble, for considerations moving from him only, they were in fact made to him as trustee for the Coyote company, and the consideration was in effect paid by Kelly, it having been paid for him in the manner before described. One incident alone need be referred to to show that such was the character of this transaction. Murphy, as has already been stated, had made a deed of his farm at the agreed value of $1,500, under an agreement with Kelly, to accept it as a payment of that amount on the price he was to get for the entire property. This deed was delivered by Murphy as an advance of so much upon his subscription for stock. Under the terms of his arrangement with Kelly the deed was made to Kelly and O'Shea jointly—Kelly accepting it as a payment of $1,500 on the amount due him from the company, and O'Shea accepting it as a payment of $750

on the amount due him from Kelly for his mining property. By Kelly's agreement with O'Shea for the purchase of his property, he was to pay $3,300 for it. Ruble only paid O'Shea at the time he executed his deed $2,550, remarking that he had already been paid $750 on the price, which O'Shea assented to without objection. Ruble had authority from Murphy to take the benefit of this deed as a payment to Kelly by the Coyote company, but he neither had nor pretends to have had any authority to appropriate it, in payment or settlement of any debt or liability of his own.

The Coyote company was finally organized by the election and qualification of its officers, at a meeting of its stockholders held at Monmouth, September 14, 1878. Ruble was secretary of the meeting and kept the journal of its proceedings. This journal thus kept by Ruble himself as secretary of the stockholders meeting, shows that he "claimed the right to cast 50,000 votes on his own subscription; 40 proxy votes for G. W. Sloper; 1,000 proxy votes for John Vernon; and for R. Doty two thousand (2000); making 53,040 votes." The same record also shows that it was afterwards agreed among the stockholders present at the meeting, "to dispense with the counting of the vote upon the amount of stock represented, and that each subscriber present be allowed one vote." Under this agreement "among the stockholders" Ruble cast one vote as did each of the other subscribers present. Ruble was chosen one of the directors of the company, at this meeting and duly qualified as such. He was chosen secretary, and entered upon the discharge of his duties as such. He continued to fill both of these positions in the company until as late as January 16, 1879, although the company had instituted a suit against him to compel a conveyance of the property deeded to him on the 2d and 4th days of September previous, to the com-

pany in execution of the trust assumed by him when he obtained such deeds, and Kelly had completed the performance of his obligation to the company by a conveyance of the remainder of the property to it on the 6th day of the preceding December, with full knowledge necessarily on Ruble's part of all the facts. As secretary of the company, he transferred every subscription, except his own, on the "Muncy subscription" paper to another paper containing a regular and formal subscription contract for stock of the Coyote company without any further authority from the subscribers for that purpose. At the same meeting of the stockholders, he signed a written document known as the "Monmouth paper," which purported to be an agreement between subscribers for stock of the Coyote company as a subscriber for "50,000 shares." This agreement also contains a stipulation for the sale of stock of the company "to the amount of 200,000 shares—*including any shares already subscribed*"—on the same terms precisely as those contained in the previous "Muncy subscription" paper. The evident meaning of this stipulation is, not to sell the "shares already subscribed," but to sell enough to make, with the shares already taken, the aggregate number of 200,000; which was the total amount of stock designed from the first.

Upon these facts, I cannot see how Ruble can escape liability on his subscription for 50,000 shares of the capital stock of the Coyote company. Yet it is said in the opinion of the majority of the court that "it is in evidence that Ruble is not a subscriber to the capital stock of the Coyote Gold and Silver Mining company. He does not owe a dollar to the corporation." But in view of the conceded facts in the case, which clearly prove the understanding and intention of Ruble and the other subscribers to the "Muncy Subscription" paper, to be bound by their subscriptions,

upon that paper, for so many shares of the capital stock of the Coyote company, as they had there subscribed for, I am led to suppose that this assertion is based upon a certain legal proposition advanced in the opinion, which seems to declare the doctrine that contracts made in advance of the legal organization of a company or corporation, although in contemplation thereof, and upon sufficient consideration on its behalf or for its benefit, are invalid and incapable of enforcement by such company or corporation after its regular organization and acceptance of such contract. There is no other ground upon which it can be placed with even the semblance of a reason to sustain it. The company was organized by the election and qualification of its officers when there was no other subscription for capital stock than that appearing upon the "Muncy Subscription" paper. Those who participated in the stockholders' meeting on September 14, 1878, and voted for officers of the company, at the election then held, had no other claim to be deemed stockholders than that they were subscribers on that paper. If their subscriptions upon that paper were not subscriptions for the capital stock of the company, then none of its stock had been subscribed for, and the entire proceeding to organize the company was a farce. The number of shares of stock specified in the articles of incorporation, as well as in the "Muncy Subscription" paper, was 200,000. Excluding Ruble's subscription for 50,000 shares would leave less than one-half of the capital stock subscribed for, and render any organization of the company impossible, under the statute. Yet Ruble was one of the most active and efficient promoters of and participants in the organization, and accepted and exercised the functions of two of the most important offices of the company under the organization so effected. If he was not a subscriber for the capital stock

of the company, his conduct in the premises is wholly indefensible. And it may not be amiss as illustrating the understanding which all the other subscribers to the "Muncy Subscription" paper had of the character of that document, and the effect of their subscriptions thereto, and almost necessarily Ruble's understanding also of his own relation to the same transaction, to remark, that almost every one of the nineteen other subscribers upon that paper for shares ranging from one to seven thousand five hundred respectively, advanced the amount, or at least a portion of it, upon his subscription, which by the terms thereof he was to pay down to enable the company to complete the payment to Kelly for the property, according to the terms of the written obligation to Muncy of July 1, 1878. The amounts so paid, together with the $8,750 advanced by Ruble in the same manner, reduced Kelly's claim of $27,000 to the sum of $11,664 75, to recover which and enforce its payment under his vendor's lien against the entire property, whether standing in the company's name, or in the names of Ruble, or his grantees with notice and without consideration, as the trustees of the company, this suit was instituted. None of the other subscribers ever claimed, so far as anything in the record before us gives, any indication that the amount thus advanced by him was not intended to be, or in fact, money paid for the company on account of his subscription to its capital stock, to be applied on the purchase of the entire property from Kelly; and yet many of them advanced more in proportion to the number of shares subscribed for, than Ruble did.

As to the legal question involved in the proposition referred to as the probable foundation of the assertion in the opinion that "it is in evidence that Ruble is not a subscriber to the capital stock," &c., and "does not owe a dollar to the

corporation," I think but little need be said.   While the
articles of incorporation were duly subscribed and acknowl-
edged at Salem, on the 27th day of August, 1878, and were
duly filed in the office of the secretary of state on the 30th
day of that month, no copy was filed in the office of the
county clerk of Jackson county, where the business of the
company was proposed to be conducted, as the statute re-
quires, until the 6th day of September, 1878.   The copy
designed for this purpose was given to Ruble when he left
Salem for Canyonville on August 30, 1878, to take out
there to show to Kelly, and then forward to the county clerk
of Jackson county for filing.   He met Kelly in Canyonville
as already stated, on September 1, 1878, and no doubt ex-
hibited the copy to him at that time; but he did not for-
ward it as he should have done immediately, but waited un-
til he had returned from the mines and all the deeds made
to him had been executed, before attempting the fulfillment
of this duty.   The deeds were executed on the 2d and 4th
days of September, as already shown, while the copy of the
articles of incorporation was not mailed at Canyonville un-
til the 5th day of the same month.   It was received and
filed by the county clerk of Jackson county on the day fol-
lowing.   And this is the way the Coyote company hap-
pened to have no legal existence when the deeds to Ruble
were executed.   I do not question the correctness of the po-
sition that the Coyote company was not legally and com-
pletely incorporated until this copy was filed in the office of
the county clerk of Jackson county.   Such seems to me to
be the true construction of the various provisions of the
statute relating to the formation of private corporations.
But I do deny most emphatically that the non-existence of
the corporation, under all the circumstances I have related,
can rightfully be held to absolve Ruble from either his lia-

bility as a stockholder, or his duty as a trustee. Here all parties acted either in view of the future organization of a company, or under the belief that it already existed. There is no principle of law which precludes a company, after its organization, from asserting rights secured to it by contracts upon sufficient consideration, made on its behalf or for its benefit previous to its incorporation, but in contemplation of that event. The most familiar illustrations of the law upon the subject are to be found in the decisions upon the validity and binding force of subscription contracts made before, but in view of the incorporation of the company whose stock is thus subscribed for in advance; yet the principle itself is, as it must necessarily be, universal; and cases are not wanting where it has been applied to other contracts by high judicial authority. (*Anderson* v. *The Newcastle &c., Railroad Co.*, 12 Ind., 376; *Johnson* v. *The Wabash &c., Plank Road Co.*, 16 *Id.*, 389; *Buffalo and N. Y. City R. R. Co.* v. *Dudley*, 14 N. Y., 336; *Lake Ontario, &c., R. R. Co.* v. *Mason*, 16 *Id.*, 451; *The Reformed Protestant Dutch Church* v. *Brown*, 29 Barb., 335; *Penobscot Railroad Company* v. *Dummer*, 40 Me., 172; *The Danbury and Norwalk Railroad Co.* v. *Wilson*, 22 Conn., 434; *Cross* v. *Pinckneyville Mill Co.*, 17 Ill., 58; *Griswold* v. *Trustees of Peoria University*, 26 Ill., 41; *Johnson* v. *Ewing Female University*, 35 Ill., 518.)

These and numerous other authorities, which might be cited to the same effect, fully establish the doctrine that subscriptions for stock in a proposed corporation not yet formed, become binding upon the supscribers as soon as the incorporation takes place, and that it is no defense to an action by the company to recover the amount of such a subscription, to plead the non-existence of the company at the time its stock was subscribed for. It seems obvious that

if this doctrine is sound in principle, it cannot be restricted in its operation to contracts of subscription only. There is nothing so peculiar about contracts of this class as to justify any such restriction. And accordingly it has been held that an independent promise on sufficient consideration to pay money to designated trustees for the purpose of building a plank road, with authority to such trustees to transfer the obligation to "a company hereafter to be formed for the purpose of building said road," was valid in the hands of the proposed company after its formation, and the transfer of the obligation to it by the trustees, pursuant to the authority given therein. (*Eastern Plank Road Co.* v. *Vaughn*, 14 N. Y., 546.) Selden, J., in concluding the opinion in the case says: "The defendant is therefore liable, not as a subscriber to the capital stock of the company, but upon his independent promise made upon a sufficient consideration. There can be no doubt of the corporate power of the company to receive and enforce such a promise, it being made for the express purpose of enabling the company to accomplish the object of its incorporation." And substantially the same doctrine was held by this court in the case of the *Coyote G. & S. Mining Co.* v. *Ruble*, 8 Or., 284, with reference to the identical transaction now under examination. In effect it is there declared that Ruble obtained the title to the portion of the property deeded to him on the 2d and 4th days of September, 1878, under such circumstances as would entitle the company in equity to compel a conveyance to itself, on repaying him the amount of money advanced by him upon the purchase thereof (p. 299.) How could this be unless the agreements among the promoters of the company previous to its incorporation were accorded some validity and binding effect which the company could enforce? It is true the majority of the court held in that case that

the proofs failed to show that Ruble was a subscriber for the capital stock of the company. This decision is not however conclusive on the point here. Some of the facts found by the majority of the court, in that case, as appears from the opinion, cannot be deduced legitimately from the proofs before us. The parties are not the same, nor can we determine whether the proofs are the same or different. The decision of this court in *The Grangers Market Co.* v. *Vinson*, 6 Or., 172, cited in that case as supporting the opinion on this point, certainly has no particular application to the facts established here. But at any rate the opinion in the case of the *Coyote G. & S. Mining Co.* v. *Ruble* recognizes the legal principle for which I contend, and for that purpose alone have I referred to it. And it does seem to me, that the proposition that a party can accept a conveyance of real property in trust for a corporation not yet formed but in contemplation of the promoters of the same causing such conveyance to be made, and afterwards successfully resist the execution of his trust in a suit brought by the company after its incorporation for that purpose, on the ground that at the time the property was conveyed the company was not in existence, is so completely at variance with sound reason and fundamental legal principles, that the citation of authority to refute it can hardly be required. But if the law were otherwise than I have supposed it to be, there are Ruble's representations to Kelly as to the incorporation of the company; his own subscription and that of others to the capital stock of the company; the advance of the money paid by the subscribers on such subscriptions for the company; his own authority to act as agent and trustee of the company in making payments to Kelly and taking titles in his own name in trust for the company, and Kelly's action thereon under a reasonable belief in their truth, to

estop him from denying their truth. If he is so estopped in this litigation, it is wholly immaterial to the result, whether any of the facts so represented existed or not; they must be taken and considered as the real facts in the case and for every purpose connected with the suit. If this is not what the estoppel in the particular case signifies, I must confess I have never understood the general nature of the doctrine. An estoppel must be mutual. But that means in this case mutuality between Ruble and Kelly. It is not essential to Kelly's right to claim the benefit of it in this suit between himself and Ruble, that it should appear to be also available in any litigation between Ruble and the company involving the same transaction. The argument in the opinion upon this point is that as Ruble would not be estopped to deny the truth of his representations to Kelly, in any suit by the company to compel him to execute the trust which he represented to Kelly he was assuming on behalf of the company in taking the deeds in his own name, therefore he has the same privilege in this suit brought by Kelly against him and based upon the same trust. Yet while I am fully satisfied that Ruble, on the proofs in the case, is clearly shown to be the trustee of the company, as was virtually held by this court in the previous suit of the company against him already mentioned, and also a subscriber for 50,000 shares of its capital stock, which the court in that case on the evidence before it held not to have been proven, I think it may safely be conceded for the sake of the argument that he was not such trustee in fact, and still being estopped to deny his representations to that effect, the final determination must be the same. Kelly's rights under such circumstances cannot be measured by those of the company, as is insisted in this argument. Take for instance the case which the majority of the court in the former suit

of the Coyote company against Ruble found to be made out by the proofs before them, that Ruble held the property in trust, but as he was not a subscriber for capital stock of the company, he therefore owed it nothing, and the money furnished by him towards the purchase was his own individual property.   Upon this state of facts, they rightly concluded that equity would not compel Ruble to convey the property to the company unless the company would repay him the amount of money he had expended towards its purchase. But as between Kelly and Ruble no such equity exists in favor of the latter.   If Kelly had full knowledge even that Ruble was advancing his own money for the company on the purchase—assuming such to have been the fact—he would still have the right in equity to treat the money so advanced for the company, as its money, and as being simply a part payment by it on the purchase price of the entire property.   For this would be in perfect accordance with the evident understanding and intention of the parties, as well as with the plain legal effect of the transaction.   And the case is only made stronger by the consideration that Ruble represented to Kelly that the money he paid was due the company on subscriptions for its capital stock, and Kelly was induced by such representation to accept it as such. But I deem it needless to proceed further with the discussion of the question whether Kelly can take the benefit of an estoppel against Ruble under the circumstances, when the company cannot.   I think it plain that he can.

The next proposition of law maintained in the opinion of the majority of the court is, that the conveyances to Ruble, being executed at different dates, severed the entirety of Kelly's contract with the company to convey it the whole property for a single price, if, in fact, such contract ever existed.   It is claimed that this was one of the effects of

the statute of frauds upon the transaction. Kelly's agreement with Ash & McWilliams for the purchase of their mining property was by parol, and consequently within the statute of frauds. Their deed was not executed to Ruble until the 4th day of September, 1878, while all the other deeds to Ruble had been executed two days before, on the 2d day of the month. It is also assumed that Kelly's contract to convey the entire property to the company for the single price of $27,000 must be considered as having only the force of a parol contract. The objection to considering Kelly's contract to sell to the company as an entire contract in both cases, is very similar in nature and precisely identical in effect. In the first case, it is asserted that Kelly could not have sold the Ash & McWilliams property under the same contract with the other property conveyed to Ruble on September 2, 1878, because at that time he had no title, or claim, to it enforcible either at law or in equity. In the second case, it is claimed that each separate conveyance was in legal effect a performance of a distinct contract to sell the portion covered by it. And the conclusion in this instance is reached upon the principle that a parol contract to sell real property is invalid under the statute of frauds until it has been executed by conveyance.

The first objection amounts substantially to a denial that a party can sell real property he does not own, or have a valid claim on, at the time. But that he can do it, is a proposition which the authorities fully sustain. (*Trask* v. *Vinson*, 20 Pick., 105; *Stearns* v. *Foote, Id.*, 432.) It can make no difference to the purchaser whether the seller has any title or right to the property either at the time of sale, or ever, if he receives a conveyance of the title through the seller's instrumentality according to the terms of his engagement. If a party can sell one tract of real property he has

no interest in, or claim on, at the time of making the con-
tract to sell, no possible reason can be assigned why he can-
not as well contract to convey two or more separate tracts
in the same situation for a single price.  If he causes con-
veyances of all the tracts to be made to the purchaser in the
manner and within the time agreed upon, will he not have
performed his agreement and entitled himself to the stipu-
lated single price for all the tracts conveyed?  In such a
case the objection would lie as well where the contract to
convey is in writing, as where it is by parol.  If perform-
ance of a parol agreement to convey real property, takes it
out of the operation of the statute of frauds, which is con-
ceded to be the law, it must be the parol agreement actually
made between the parties that is thus rendered valid.
There is no other; and certainly it will not be contended
that any promise to pay a price for real property will be
implied in law from the mere fact of conveyance.  Where,
then, as in the present instance, a party makes a parol agree-
ment to convey, or cause to be conveyed, the title to several
distinct tracts of real property for one price for the whole,
the conveyance of one, or any number of such tracts, less
than the whole, is no performance of such parol agreement,
or any agreement between the parties.  It is a part of such
performance, but the agreement itself is not executed until
all have been conveyed.  The error in the position taken in
the opinion upon this point, I conceive to be in assuming
that the conveyance of a portion of the property by itself,
at a different date from the conveyances of the other por-
tions, executed the contract under which the conveyances
took place.  This would have been true if the contract had
been to convey such portion by itself for a separate price.
But there was no such agreement, and such conveyance
plainly was no performance of Kelly's contract to convey

the whole property for a single price. That contract was not performed until he conveyed the remainder of the property directly to the company on the 6th day of December, 1878. The state of Kelly's title prior to performance of his agreement to convey, can have no possible bearing on the question as to the entirety of his contract of sale. The entirety of his contract consisted in his agreement to convey the whole for a single price, and the mode of performance had nothing whatever to do with it. If he performed within the time, and it was accepted by the company, what possible difference can it make that such performance took place partly on one day and partly on another day? It was all one act, no matter how many different days it occupied in its execution, and when completed amounted to but a single performance. In answering the first, I have also answered the second objection. The conveyances to Ruble of September 2, 1878, were no performance of any contract, parol or otherwise, on Kelly's part, to convey to the company ; and as upon the theory presented in the opinion itself, there was no contract of sale until performance, there could have been no such contract until the conveyance of December 6, 1878, was executed, as there was no performance until then. There is no difficulty in conceiving of the several conveyances either made or caused to be made by Kelly as embraced in, and constituting but a single act of performance of his entire contract. And such seems to me to have been the plain, legal effect of these several conveyances, although made by different parties and at different dates. The promise of the company to pay the price never was within the statute of frauds. It lacked sufficient consideration, while Kelly's parol promise to convey the title remained executory. When that was executed by conveyance, to the acceptation of the company,

its promise to pay the stipulated price became valid and binding. The conveyances and their acceptance by the company, whether made to Ruble as its trustee, or directly to itself, were a sufficient consideration for its promise to pay the purchase money. In the next place, it is asserted in the opinion, that Kelly is precluded by the statute of frauds from offering parol evidence to establish such performance on his part of his entire contract to convey to the Coyote company. The proposition made with particular reference to the Ash & McWilliams deed—but equally applicable to each deed that was made to Ruble—is thus stated in the opinion: "It appears on its face to have been a sale made by Ash & McWilliams to Ruble, and when Ruble swears that such was the transaction and it is shown that he paid the consideration to them, no amount of parol testimony can overcome these facts." I cannot understand why Ruble's testimony should be accorded such conclusive effect in regard to the matter. But it is evident that his testimony may be taken out of the proposition entirely, and the remainder of the facts assumed, if correct, would justify the conclusion announced. If Ruble were shown to have "paid the consideration" for the Ash & McWilliams property, or any other portion of the property, on which Kelly claims a vendor's lien, he could have no relief with respect to it. But Ruble did not pay any of the consideration, as I feel assured, has been made apparent. The money he paid was only furnished in part by him, and that was advanced for the company, upon his subscription, and he so represented the fact to Kelly at the time. To say that Ruble "paid the consideration" for the property, or any portion of it, in view of such facts, is clearly unjustifiable. Besides, it was paid for Kelly and was, therefore, in legal effect paid by him.

Kelly had a perfect right to show by parol testimony who paid the consideration for the deeds that were executed to Ruble, notwithstanding they recited the receipt thereof from Ruble, and notwithstanding Ruble's testimony that "such was the transaction." And when he had thus shown that the consideration was paid by himself and not by Ruble, a case of resulting trust was made out, which was not within the operation of the statute of frauds. (*Boyd* v. *McLean*, 1 Johns. Ch., 582; *Getman* v. *Getman*, 1 Barb· Ch., 499; *Sweet* v. *Jacocks*, 6 Paige, 355.) The first of these cases is so similar in its material facts, as well as the principles involved, to the case here, that I cannot forbear a somewhat extended reference to it. It was decided by Chancellor Kent in 1815, and its authority has never since been questioned, that I am aware of, until now. It was a case of resulting trust, like the present. The defendant, McLean, who, by his agent Ross, handed the amount, the plaintiffs, J. & H. Boyd, were to pay Colden, the grantor of the land, for it, out of the defendant's funds, but on account of the plaintiffs and as a loan to them, under a parol agreement, and took an absolute deed for the property in his own name, reciting the payment of the consideration by him, but under a parol agreement with the plaintiffs to hold the same in trust for them, and upon receiving payment of the amount so loaned to convey the legal title to them, in his answer to the bill filed to compel him to execute the trust, denied the loan and the alleged parol agreements altogether, and set up, just as Ruble has done here, that he bought the property on his own account and with his own money, and claimed the benefit of the statute of frauds upon the same grounds Ruble does; and to complete the resemblance, his counsel argued that he "having absolutely denied any loan or trust, the parol evidence was inadmissible," and cited

Sugden on Vendors, the same authority cited in the opinion in the present case, in support of the same proposition.

The distinguished chancellor, however, denied the applicability of the statute of frauds in such a case, after reviewing the authorities on the subject with his usual ability and research, and not only admitted the parol testimony, but upon proof of the above facts by such testimony alone, decreed a conveyance of the property to the plaintiffs.

It is also assumed in the opinion that the equity doctrine as to the character of proof requisite in cases of specific performance is applicable here, and numerous decisions illustrative of that doctrine are cited. But this was needless. This is not a case for specific performance, and no reason can possibly be given why the same rule as to proof should apply. Kelly has performed his promise, which was the only one within the statute of frauds. There is no such thing in the case as a part performance of an agreement within the statute, and an attempt on the ground of such part performance to enforce the balance of such agreement. The only agreements in the case within the statute have been fully executed, and all that is sought by the suit is to establish the fact that such performance was the consideration of a parol agreement to pay a certain amount in money, and to enforce payment thereof, if necessary, through the equitable security afforded by a vendor's lien. The fact of conveyance must no doubt be shown from the deeds themselves; but that such conveyance was made under a parol agreement as to price can only be shown by parol evidence; and such proof is not prohibited by the statute of frauds. The rule in equity, therefore, in relation to the kind of proof required where a conveyance is sought to be compelled, founded on the policy of the statute, cannot rightfully be invoked by force of analogy in a case where the

vendor of real property having fully performed his contract to make title, only seeks to recover from the purchaser the price verbally agreed to be paid therefor, and as incident thereto, to enforce his vendor's lien. The statute of frauds has no application to such a case. It has been held repeatedly that the assignment of a parol contract for the purchase of real property upon a promise to pay for such assignment, where the parol contract to convey is subsequently executed by a conveyance to the assignee, is a sufficient consideration for the promise to pay for such assignment, and that such promise may be enforced by action—the statute of frauds not applying to such a case. (*Kratz* v. *Stokes*, 42 Mo., 351; *McCarthy* v. *Pope*, 52 Cal., 561.) In the last case, all the agreements were by parol.

It has also been held that a promise of the vendor of real property at the time of the acceptance of the deed by his vendee, to pay an assessment on the premises conveyed, in consideration of such acceptance, and payment of the purchase price agreed upon, by the vendee, is valid, and not within the statute of frauds. (*Remington, et al.* v. *Palmer*, 62 N. Y., 31.) If the statute has no application to cases like these, and parol evidence is admissible to prove the consideration for the parol promise to pay, what reasonable objection, based upon the statute, can there be, to proving by parol evidence that a conveyance of real property itself, was the consideration for the parol promise to pay the stipulated price? In the case of *Russell and wife* v. *Watt, adm., et al.*, 41 Miss., 602, the same state of facts was presented, and the same relief sought as in the case here. Mrs. Russell contracted with Moore to sell and make him title to a certain piece of real property, the title to which was not in her, but in one Booth. There was no writing between either Mrs. Russell and Moore, or between her and Booth, but

Booth made a deed conveying the title to Moore, at her instance.  She afterwards brought the suit to enforce a vendor's lien against the land in the hands of Moore's representatives and vendee, with notice of the nonpayment of the purchase money, for the amount Moore had verbally agreed to pay her for the property.  The principal defense was the statute of frauds.  The question was thus presented by counsel for the defendants: "This suit is brought to enforce a right which cannot exist by virtue of there being a legal and valid sale of land made by Mrs. R. to Moore.  The sale as between them was not in writing.  The sale is denied by Moore, who alleges he purchased from Booth.  How can the suit be maintained except by showing by parol that such a sale was made, and that Mrs. R. and not Booth was the vendor?  To state the question is to answer it."  Nevertheless, the court held she could show by parol testimony that she was the vendor, although not the grantor in the deed of conveyance, and that upon the given state of facts was entitled to the relief sought.  (Citing *Holloway* v. *Ellis*, 25 Miss., 103.)  *Rutland* v. *Brister*, 53 Miss., 683, is a similar case in all respects.  The same objection on the ground of the statute was interposed, but seems to have been entirely ignored in the opinion of the court.  The relief sought was granted.  (See also *Perkins* v. *Gibson*, 51 Miss., 699; and *Anderson* v. *Spencer*, *Id.*, 869.)  Precedents more directly in point could hardly be expected.

But if the assumption that the rule as to the character of proof is the same here, as in cases for specific performance, could be admitted to be correct, which it clearly cannot, it could not have the effect ascribed to it in the opinion.  The mere execution of the deeds, on their faces absolute, to Ruble by the holders of the legal title to the property conveyed by them, by itself, would not afford any evidence of

an agreement by Kelly to convey to the Coyote company, it is true. But this was not all of Kelly's act of performance. He paid for the property, and procured the execution of the deeds to Ruble, in trust for the company. And it certainly cannot be contended with any appearance of plausibility, even that such acts of performance afford no evidence of the agreement between himself and the company, under which he claims a vendor's lien for unpaid purchase money. But as the rule in cases of specific performance is plainly inapplicable to a case like the present, I deem it needless to pursue the subject farther.

That Kelly was the vendor of the whole property, although not the grantor of a portion of it, and entitled to a vendor's lien upon the whole for the balance of the purchase money remaining unpaid at the commencement of this suit, upon the conceded facts, under the authorities I have cited, I am perfectly satisfied; and I do not believe a parallel case on the facts can be found in the books, where such relief has been denied.

In concluding their opinion, the majority of the court have seen fit to express a doubt as to the existence of the vendor's lien, in any form, in this state. In my own mind, there is no such doubt. The decision of this court, in *Pease* v. *Kelly*, 3 Or., 417, it seems to me is conclusive of the question. It is stated in the opinion that "the existence of such lien was not intended to be decided" in that case. The question was properly before the court in that case. It was in the argument, and many of the same authorities cited upon it which Ruble's counsel have cited here, as the published report of the case shows. A mortgage had been given for the purchase money, and the only two questions considered were whether the lien existed generally, and if so whether it had been waived, in the particular case by

taking the mortgage as security for the purchase money. The court say: "The lien exists, if there is no higher security, but we think that the taking of a mortgage, which is an open and public lien, is a waiver of the vendor's lien, and we think that both liens cannot exist at the same time, and such seems to be the well established doctrine of the cases." And it was held accordingly that the lien did not exist in that case. The court might have waived any decision of the point, but it had the undoubted jurisdiction to decide it, and the language of the opinion seems to me clearly to denote an intention to determine it. If such was the intention, what the court said upon the subject was not *dictum*, merely, because it might have been avoided. And such seems to be the opinion generally entertained as to the effect of this decision. (*Coos Bay Wagon Road Co.* v. *Crocker*, 6 Sawyer, 580.) But, putting this decision entirely aside, I do not see how the existence of the vendor's lien here as a doctrine of the common law can be reasonably controverted. It is not contrary to any provision or policy of our state legislation. On the contrary, section 410 of the civil code adopted in 1862, seems to sanction the existence of such liens. It provides for the foreclosure by suit of all liens on real and personal property "other than that of a judgment or decree, whether created by mortgage or otherwise." It is plain this section contemplates the existence of liens not of record; and why should it not be construed to include the vendor's lien? (2 Story's Eq. Jur., sec. 1218; Sugden on Vendors, p. 376, note "d"; *Macreath* v. *Symmons*, 1 Lead. Cas. Eq., W. & T., 481; 1 Perry on Trusts, [2d Ed.,] sec. 232 and note "5.")

Of the two cases cited in the opinion as justifying the doubt expressed—*Ahren* v. *Odiorne*, 118 Mass., 261, and *Kauffelt* v. *Bower*, 7 S. & R., 64—(also published in 10

Am. Decis., 428,) it may be said with propriety, that while they vigorously and ably attack the very foundation of the doctrine of the vendor's lien as an original question, they can only be regarded as authorities to the extent of holding, that under the peculiar and exceptional conditions of things existing in the states of Massachusetts and Pennsylvania, where they were announced respectively, it was competent to presume the lien had never been adopted as a doctrine of the common law. But in this state, no such conditions existing, these decisions cannot be considered as authorities against the existence of the lien; and the general presumption that the common law prevails ought, in my judgment, to be decisive of the question in the affirmative, even if it were an original one, now for the first time before this court, which I cannot admit.

I think, therefore, the decree of the circuit court ought to be affirmed.